1  **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                       **FOR THE DISTRICT OF ARIZONA**

8

9      IN THE MATTER OF:                    No: CV-20-02219-PHX-JAT

10     Swift Air, L.L.C.                    **ORDER**

11
                              Debtor.
12

13     MorrisAnderson & Associates Limited,

14                         Plaintiff,

15     vs.

16     Redeye II LLC, et al.,

17

18                        Defendants.

19         Before the Court are the Report and Recommendation (the "Report and

20  Recommendation"), (Doc. 19-2 at 65–262),[1] containing the proposed findings of fact and

21  conclusions of law of the United States Bankruptcy Court for the District of Arizona (the

22  "Bankruptcy Court"). Defendants Redeye II LLC, et al. ("Defendants") object to specific

23  portions of the Report and Recommendation and filed Objections to the Report and

24

25  ───────────────

[1] This case is related to the appeals in *Swift Aircraft Management LLC v. MorrisAnderson*
26  *& Associates Limited*, Case No. CV-20-00854-PHX-JAT, *Transjet Incorporated v.*
    *MorrisAnderson & Associates Limited*, Case No. CV-20-00849-PHX-JAT, and *Redeye II,*
27  *LLC v. MorrisAnderson & Associates Limited*, Case No. CV-20-00855-PHX-JAT (the
    "Redeye Appeal") (together, the "Related Appeals"). The appellants in the Related Appeals
    have briefed issues that cross all the Related Appeals and this case in the appellants'
28  Opening Brief in the Redeye Appeal as permitted by Fed. R. Bankr. P. 8014(e). Any
    citation of Docs. 19, 19-1, 19-2, 19-3, 19-4, 19-5, 19-6, 19-7, or 19-8 will refer to the
    appellants' Opening Brief and attachments in the Redeye Appeal.

1   Recommendation. (Doc. 1 at 6–83). Plaintiff MorrisAnderson & Associates Limited
2   ("Plaintiff" or the "Trustee") filed a Response. (Doc. 1 at 87–125). After reviewing the
3   filings and the record, the Court issues the following order.[2]

4   **I.   BACKGROUND**

5       The below is a brief summary of the background of this case. A more extensive
6   discussion of the background can be found in the Report and Recommendation, (Doc. 19-
7   2 at 75–116), and the appellants' Opening Brief in the Redeye Appeal, (Doc. 19 at 10–14).

8       Prior to December 21, 2011, Swift Air, LLC ("Swift" or the "Debtor") operated as
9   an aviation management company under a combined 14 CFR Part 121/135 Certificate
10  ("Part 121 Certificate" and "Part 135 Certificate") issued by the Federal Aviation
11  Administration ("FAA"). (Doc. 19 at 10). Swift's business involved managing aircraft
12  owned by other parties and booking charter contracts. (*Id.*). Swift maintained a Part 135
13  Certificate business which managed corporate/individual charter flights (the "Part 135
14  Business"), and Swift also maintained a Part 121 Certificate business which consisted of
15  flying large charter groups, in particular, professional sports teams (the "Part 121
16  Business"). (*Id.* at 11). Keeping the Part 121 Certificate operational required that certain
17  criteria be satisfied, such as having five specific positions filled by qualified employees
18  (the "Five Wise Men").[3] (Doc. 19-5 at 173–74).

19      Swift was a wholly owned subsidiary of Swift Aviation Group, Inc. ("SAG"). (Doc.
20  19-2 at 260). SAG also held all the equity interests in Swift Aviation Sales, Inc. ("Sales"),
21  Swift Aviation Management, LLC ("SAVM"), and Swift Aviation Services, LLC
22  ("Services"). (*Id.*). SAG was wholly owned by the Jerry and Vickie Moyes Family Trust

23  _____
    [2] The Bankruptcy Court found that it only had the authority to issue a Report and
24  Recommendation on all of Plaintiff's breach of fiduciary duty claims and certain of
    Plaintiff's fraudulent transfer claims. (Doc. 19-2 at 75). The Bankruptcy Court determined
25  that it had the authority to enter final judgment on Plaintiff's preference claims, but this
    Court determined in the Redeye Appeal that the Bankruptcy Court could only issue a report
26  and recommendation on the preference claims against Redeye II, LLC, Jerry Moyes and
    Vickie Moyes, and the Jerry and Vickie Moyes Family Trust. *See Redeye II, LLC v.*
27  *MorrisAnderson & Associates Limited*, Case No. CV-20-00855-PHX-JAT, Part III.A (D.
    Ariz. Dec. 1, 2020). This Order will apply only to those claims and defendants over which
28  the Bankruptcy Court did not have the authority to enter final judgments.
    [3] The positions are Chief Pilot, Director of Operations, Chief Inspector, Director of Safety,
    and Director of Maintenance. (Doc. 19-5 at 174).

(the "Moyes Trust"). (*Id.*). Jerry Moyes ("Moyes") was the sole trustee of the Moyes Trust. (*Id.*). The Moyes Trust also held all the equity interests in Transjet, Inc. ("Transjet"), Transjet's three subsidiaries (the "Transjet Subsidiaries"), Transpay, Inc. ("Transpay"), and SME Steel Contractors, Inc. ("SME"). (*Id.*). Moyes also personally owned fifty percent of Redeye II, LLC ("Redeye"). (*Id.*). Moyes served as Swift's president, and Kevin Burdette ("Burdette") served as Swift's vice-president. (*Id.* at 78). The companies owned by Moyes and the Moyes Trust regularly did business with one another and through this business incurred significant accounts receivable and accounts payable that were outstanding on December 21, 2011. (*Id.* at 77–87).

In 2011, Swift's balance sheet reflected liabilities greater than assets by more than $3 million. (*Id.* at 88). In the latter half of 2011, Burdette met with two potential buyers for Swift who ultimately did not purchase the company. (*Id.*). Then, in October 2011, Jeff Conry ("Conry"), on behalf of Avondale Aviation II, LLC and Jordan Gunthorpe Holdings, LLC (collectively, the "Buyers"), approached Burdette about purchasing Swift's Part 121 Business (the "Transaction"). (Doc. 19 at 11). Notably, the Buyers told Burdette that they only wanted to acquire the equity in Swift's Part 121 Business and that they intended to merge it with their recently acquired business, Direct Air, which needed a Part 121 Certificate. (Doc. 19-2 at 88–89). The Buyers also told Burdette that they planned to obtain a $5 million investment in Swift after its acquisition. (*Id.* at 90).

The Transaction moved forward, terms were solidified, and the Buyers closed on the purchase of the equity interest in Swift for a *de minimis* payment of $100 on December 21, 2011 (the "Transaction Date"). (Doc. 19 at 11–12). Swift's Part 135 Business was not included in the Transaction, so it was transferred into a newly created entity, Swift Aircraft Management, LLC ("SAM"). (*Id.* at 12). As part of the Transaction, Swift transferred certain assets and liabilities, including accounts receivable and accounts payable, associated with the Part 135 Business to SAM and SAG pursuant to the Part 135 Assignment and Assumption Agreement and Guarantee (the "Assignment and Assumption Agreement"). (*Id.* at 13). After the closing of the Transaction, Swift and the other Moyes

1   owned companies executed an Inter-Company Settlement Agreement and Mutual Release

2   (the "Settlement Agreement"). (*Id.*). The Settlement Agreement released Swift from any

3   debts or obligations to the other Moyes owned companies and facilitated a transfer of assets

4   and liabilities between Swift and certain other Moyes owned companies (the "Transfers").

5   (*Id.*). The Transfers included a receivable from SAVM (the "SAVM Receivable") and a

6   receivable from Redeye (the "Redeye Receivable"). (*Id.*).

7        After the Transaction, the newly acquired Swift ("New Swift") experienced

8   cashflow shortages. (Doc. 19-2 at 105). The $5 million investment that the Buyers planned

9   to obtain for New Swift never materialized, and New Swift never merged with Direct Air.

10  (*Id.* at 107). New Swift also entered into new post-Transaction contracts that exacerbated

11  its money problems. (*Id.*). These and other problems led New Swift to commence a Chapter

12  11 bankruptcy proceeding on June 27, 2012. (*Id.*). New Swift emerged from its Chapter 11

13  bankruptcy proceeding through a confirmed restructuring plan in October 2013 after

14  receiving approximately $6.3 million from Nimbos Holings, LLC ("Nimbos") in exchange

15  for the equity interests in the reorganized New Swift. (Doc. 19 at 14).

16       On June 27, 2014, Plaintiff initiated the underlying adversary proceeding. (*Id.*).

17  Plaintiff's Third Amended Complaint (the "Complaint") (Doc. 19-2 at 2–27) asserted,

18  among other things, preference, fraudulent transfer, and breach of fiduciary duty claims

19  against Defendants. (*Id.*). The Bankruptcy Court held a trial after which the Bankruptcy

20  Court issued the Report and Recommendation. (*Id.* at 8, 14). During the trial, Defendants'

21  expert, Grant Lyon ("Lyon") testified as did Plaintiff's expert, Michael Spindler

22  ("Spindler"). (*See id.* at 23–24).

23       Defendants filed Objections to the Report and Recommendation. (Doc. 1 at 6–83).

24  Plaintiff filed a Response in Support of the Report and Recommendation. (Doc. 1 at 87–

25  125). The Bankruptcy Court then transmitted the Report and Recommendation to the Court

26  for review. (Doc. 1).

27  **II.   LEGAL STANDARD**

28       Matters referred to a bankruptcy court are classified as either "core" or "non-core"

proceedings. 28 U.S.C. § 157(b). Core proceedings are those "arising under title 11, or arising in a case under title 11," and non-core proceedings are those that are "otherwise related to a case under title 11." *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 558 (9th Cir. 2012), *aff'd sub nom. Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25 (2014). Bankruptcy court judges may enter final orders on all core proceedings and may submit proposed findings of fact and conclusions of law to the district court for entry of final orders on all non-core proceedings. *See* 28 U.S.C. § 157(b)–(c). Bankruptcy courts may enter final judgments in non-core proceedings "with the consent of all the parties to the proceeding." *Id.* § 157(c)(2).

Regarding proposed findings of fact and conclusions of law by a bankruptcy court, "any final order of judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1). The Court may "accept, reject or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instruction." Fed. R. Bankr. P. 9033(d). In conducting a *de novo* review, the Court must consider a bankruptcy court's findings and conclusions and afford them no presumption of validity. *10 Collier on Bankruptcy* ¶ 9033.09[3] (16th ed. Rev. 2020).

## III.   ANALYSIS

Defendants filed numerous objections to the proposed findings of fact and conclusions of law submitted by the Bankruptcy Court. (Doc. 1 at 15–82). These objections include objections to factual findings, objections to omissions of fact, objections to conclusions of law, and objections to the Bankruptcy Court's use of judicial notice. (*See id.*). These objections are addressed below.

### A.   Objections to Factual Findings

After thoroughly reviewing the parties' submissions, the record, and the proposed findings of fact issued by the Bankruptcy Court, the Court finds that the Bankruptcy Court's proposed findings of fact should be adopted, save the finding that Moyes and

Burdette were not officers of Swift. In making this determination, the Court overrules each of the objections made by Defendants to the Bankruptcy Court's proposed findings of fact, save Defendants' one successful objection. The Court will address each objection to the factual findings in turn.

> **1.    ". . . . Moyes needed to continue the 135 Business to service and manage the corporate aircraft he and Honigfeld still used."**

Defendants object to the Bankruptcy Court's finding that Moyes needed to continue the Part 135 Business to service and manage the corporate aircraft used by Moyes and his Redeye associate, Brad Honigfeld ("Honigfeld"), arguing that there is "no basis in the evidentiary record for this statement." (Doc. 1 at 16). The record shows that the corporate aircraft used by Moyes and Honigfeld was managed by Swift's Part 135 Business. (*See* Doc. 19-3 at 1232 (noting that Swift "managed, operated, and chartered the Redeye Plane under its Part 135 [Certificate]")). Additionally, it is undisputed that Part 135 Certificates cannot simply be transferred or purchased. (*Id.* at 1263). So, without the continuation of Swift's Part 135 Business, Moyes would be unable to service and manage the corporate aircraft he used without either expending the significant funds and effort required to obtain a new Part 135 Certificate or finding a new manager for the corporate aircraft he and Honigfeld used. Faced with these unfavorable alternatives, Moyes needed to continue the Part 135 Business to service and manage his corporate aircraft. Thus, the Bankruptcy Court's factual finding is supported by the record and the Court overrules this objection.

> **2.    "If Moyes could just get rid of Swift's 121 Business and have someone else pay for the Transjet Planes he could solve two important problems in one fell swoop."**

Defendants object to the Bankruptcy Court's finding that the Transaction would solve two problems for Moyes—the losses from the Part 121 Business and the personal guarantee of leases for Transjet planes—in one fell swoop. (Doc. 1 at 16). Yet there is significant evidence that both the Part 121 Business and Transjet leases presented problems for Moyes that would be cured by the Transaction. Swift's attorney, Gerald Ehrlich

("Ehrlich"), stated that "Swift Air has always had losses," (Doc. 19-2 at 95 (citing Trial Exhibit 066, November 29, 2011, Memorandum from Ehrlich to Burdette)), and Moyes's own testimony refers to the fact that the Part 121 Business would be "a very long-term challenging project," (Doc. 19-3 at 794). Further, Swift's balance sheet showed liabilities significantly in excess of assets leading up to the Transaction. (*See* Doc. 19-5 at 75). Additionally, Moyes had guaranteed debts for Transjet planes that lease agreements with Swift were helping to pay. (Doc. 19-2 at 96–97; *see* Doc. 19-3 at 434–35).

Losses, long-term challenges, liabilities that overshadow assets, and guaranteed debts are all appropriately described as problems that the Transaction would help solve. Even if Moyes was prepared to continue enduring these problems indefinitely and was not seeking a solution when the Buyers approached Swift, the Bankruptcy Court's factual finding is supported by the record. Thus, the Court overrules this objection.

### 3. "SAG transferred the SAVM Receivable to Moyes."

Defendants object to the Bankruptcy Court's finding that SAG transferred the SAVM Receivable to Moyes, arguing that this is not a fact in evidence. (Doc. 1 at 17). The Bankruptcy Court, however, supports this factual finding by citing Trial Exhibit 243, Swift Aviation Management Moyes Promissory Note Ledger. (*See* Doc. 19-2 at 98). This exhibit shows that "[p]rior to the Transaction, pursuant to the SAVM Note, Moyes was owed $14,778,275 by SAVM. On the Transaction Date, Moyes received the SAVM Receivable and the amount Moyes was owed by SAVM on the SAVM Note increased to $19,294,419." (*Id.*). Additionally, the Joint Pretrial Statement supports the Bankruptcy Court's finding by showing that the amount of the SAVM receivable was added to a promissory note from SAVM to Moyes. (Doc 19-3 at 1234). Thus, the Court overrules this objection.

### 4. In footnotes 150–152, the Court finds that the Transjet leases with New Swift were essentially pass-through leases designed to protect Moyes on his guarantees on the Transjet aircraft.

Defendants object to the Bankruptcy Court's finding that the Transjet leases with New Swift "were essentially pass-through leases designed to protect Moyes on his

Guarantees on the Transjet Aircraft" because "[t]here was no evidence introduced by the Trustee that the Transjet leases were 'designed to protect Moyes on his guarantees.'" (Doc. 1 at 17). The Bankruptcy Court, however, noted that the monthly lease payments by New Swift for the Transjet planes were exactly the same as the monthly loan obligations for those planes, and that Moyes guaranteed the monthly loan obligations on those planes. (*See* Doc. 19-2 at 103). Additionally, Burdette testified that the lease payments agreed to by New Swift in no way reflected the market value of the leases but were instead the same amount as the monthly payments owed by Transjet, and guaranteed by Moyes, on those planes. (*See* Doc. 19-3 at 626–27).

The record supports the Bankruptcy Court's finding that the Transjet leases were essentially pass-through leases designed to satisfy Transjet's obligations on the leased aircraft. Because Moyes guaranteed these obligations, any satisfaction of Transjet's obligations would necessarily protect Moyes. Thus, the Court overrules this objection.

> **5.** **"New Swift's plight was not aided by the heavy burden of its Transjet 801 and 802 lease obligations which totaled in excess of $234,000 per month, amounts which may have been well in excess of the market prices to lease such planes."**

Defendants object to the Bankruptcy Court's finding that New Swift's Transjet lease obligations may have been "well in excess of the market prices to lease such planes" asserting that the leases were negotiated at arm's length, and the evidence did not show that the lease values were above market value. (Doc. 1 at 17–18). To begin, the Bankruptcy Court stated that it was "<u>not</u> finding that the post-transaction lease rates on the Transjet 801 and 802 charged to New Swift were or were not above existing market rates." (Doc. 19-2 at 106). Thus, the Bankruptcy Court did not make the finding that Defendants object to.

Even if the Bankruptcy Court made such a finding, Burdette testified that the lease payments from new Swift on the Transjet planes were reduced from over $234,000 per month to roughly $80,000 per month through the bankruptcy process. (Doc. 19-3 at 490–91). Additionally, the lease payments were set at the amounts Transjet owed on the aircraft

at issue, not the market rate. *See supra* Section III.A.4. In fact, while the lease payments were negotiated at arm's length, the market price was specifically not considered in setting the lease amounts. *See id*. Such a drastic payment reduction along with the evidence that the market rate did not influence the payments supports a finding that the lease payments may have been in excess of market prices. Thus, the Court overrules this objection.

> **6.** **"New Swift also had significant expenses associated with its lease obligation to Transpay (employee leasing), Services (FBO sublease) and its lease obligation to Yukon on the 737 DX."**

Defendants object to the Bankruptcy Court's finding that New Swift had significant expenses associated with its lease obligations to Transpay, Services, and Yukon, Inc., a company that leased aircraft to Swift, because nothing shows that the expenses were charged at unreasonable rates or were unnecessary. (Doc. 1 at 18). The Bankruptcy Court's finding, though, simply states a fact: certain expenses associated with Swift's business were significant. (*See* Doc. 19-2 at 106). Additionally, Nicholas Huska ("Huska"), Swift's Director of Accounting and Finance and New Swift's CFO, testified that these significant expenses contributed to New Swift losing nearly $2.3 million in the first half of 2012. (*Id.* at 1150). Thus, the Court finds Defendants' objection is without merit and overrules it.

> **7.** **"The Trustee's questioning of Conry suggested that, until those plane leases were reduced, the Debtor was required to pay amounts far in excess of the market for such plane leases."**

Defendants object to the Bankruptcy Court's finding that the cross-examination of Conry suggested that, prior to their reduction, the lease payments made by Swift to Transjet were "far in excess of the market for such plane leases" because questions by counsel do not constitute evidence and the Bankruptcy Court failed to provide Conry's actual testimony. (Doc. 1 at 18–19). As noted *supra*, the Bankruptcy Court did not make a factual finding that the leases in question were above market price. *See supra* Section III.A.5.

Additionally, the finding by the Bankruptcy Court was an accurate description of the Trustee's cross-examination of Conry, New Swift's CEO in March 2012 who had years

of experience in the aviation industry. (*See* Doc. 19-2 at 132). In that cross-examination, when the Trustee asked Conry about the leases before bankruptcy, Conry believed that the leases were only $40,000 each—the renegotiated price of the leases. (*See* Doc. 19-3 at 183). Even when shown documentary evidence that the lease payments were each originally over $100,000, Conry still expressed reticence stating, "[y]eah, that's what the document says. I can't dispute that and I'm trying to recall why I think it was—it was $40,000. But that's what this document says." (*Id.* at 187). Thus, the Trustee's questioning suggested that, until they were reduced, the leases were in amounts that a person with years in the aviation industry had a hard time affirming. This, combined with the fact that the Bankruptcy Court was not making a factual finding regarding the leases but was simply characterizing testimony, lead the Court to overrule this objection.

> **8.** **After noting that Mr. Huska testified that he agreed to transfer his employment to New Swift because he thought it was a good opportunity, the Court adds the following: "Of course, if Moyes would otherwise shut down Swift, the opportunity with New Swift was likely the only real prospect available to Huska within the Swift aviation group."**

Defendants object to the Bankruptcy Court's finding in a footnote that, "if Moyes would otherwise shut down Swift, the opportunity with New Swift was likely the only real prospect available to Huska within the Swift aviation group [sic]," arguing that there is no evidence to support this finding, that New Swift was not affiliated with SAG, and that there was no evidence that Huska lacked employment prospects generally. (*See* Doc. 1 at 19–20 (quoting Doc. 19-2 at 137 n.357)). To begin, the present objection seems immaterial to the ultimate outcome of the instant claims. Defendants appear to take issue with the footnote because it signifies that Huska may have joined New Swift due to a lack of options, rather than New Swift's viability. However, the Bankruptcy Court expressly stated that "[w]hen the Transaction closed, Huska went to work with New Swift believing it was a good opportunity for him." (Doc. 19-2 at 137). Thus, this objection would have no material

impact on the overall factual findings.

Further, there is evidence in the record to support this footnote. Huska worked for Swift, and after the Transaction, Swift ceased to be a part of SAG. (*See Id.* at 161). Thus, with Swift no longer being affiliated with SAG, Huska would likely not have an opportunity with SAG after the Transaction. Additionally, while Huska stated in testimony that he could have stayed with the seller—SAG—after the Transaction, Defendants cite no evidence to support this contention. (*See* Docs. 1 at 19–20, 19-3 at 245). In fact, the record shows that the SAG companies were suffering from what Burdette described as a "zombie apocalypse financial collapse," in which "[p]eople stopped flying airplanes." (Doc. 19-2 at 1086). This evidence provides support for the inference that it is unlikely that the SAG companies would be looking to take on new executives at such a challenging financial time.

Finally, while Defendants argue that New Swift was not affiliated with SAG after the Transaction, Defendants also state that "[e]ven after the Transaction, Moyes' companies extended certain accommodations to New Swift. New Swift received $342,809.09 in rent, fuel and grounds services from Services and deferral of the Transjet leases payments in the amount of $216,154.00." (Doc. 1 at 19 n.11). This shows that, while New Swift was no longer a subsidiary of SAG, the record supports the finding that a job with New Swift would likely keep Huska tied to Moyes and SAG. Thus, the Court overrules this objection.

> **9.**   **"Burdette saw Buyers' [sic] intended to bring on Van Lier, a knowledgeable aviation operator, the type of person Swift lacked. This combined with Direct Air's summertime business reflected a business plan that could succeed where Swift was failing. Burdette testified that he felt the sale to Buyers was in Swift's best interest. By 'Swift' [the Bankruptcy] Court took Burdette to mean the Swift family of companies (Transpay, Transjet, Services, Swift, etc.)."**

Defendants object to the Bankruptcy Court's statement that when Burdette testified

that the Transaction was in Swift's best interest, the Bankruptcy Court believed he meant the Swift family of companies. (Doc. 1 at 20). Yet, the Bankruptcy Court did not definitively find that Burdette was referring to the Swift family of companies in his testimony, but merely expressed that the Bankruptcy Court believed Burdette was referencing the Swift family of companies. (*See* Doc. 19-2 at 140). This is a reasonable belief as both immediately before and after this specific statement by Burdette, Burdette's testimony centered on the Swift family of companies, rather than Swift alone. (*See* Doc. 19-3 at 462–64). Additionally, the Bankruptcy Court's belief was reasonable in light of the fact that Burdette was not only an officer of Swift, but also an officer of other companies in the Swift family including SAVM, Trasjet, the Transjet Subsidiaries, Services, Sales, SAM, SAG, and Transpay. (*See* Doc. 19-2 at 78–82). Because the Bankruptcy Court's belief was reasonable and did not amount to a factual finding, the Court overrules this objection.

### 10.    **"Burdette acknowledged it was his responsibility to make sure Fowler's $5 million came into New Swift."**

Defendants object to the Bankruptcy Court's finding that Burdette acknowledged that it was his responsibility to make sure Fowler's $5 million came into New Swift arguing that "[t]his finding is demonstrably false and has no basis in the evidentiary record." (Doc. 1 at 21–22). Yet, Burdette testified that, without the plan for a $5 million capital infusion, he would not consider the Buyers to be serious purchasers for Swift, (Doc. 19-3 at 448), he was the only person he knew of that did due diligence on behalf of Swift, (*Id.* at 542), that Swift would "[a]bsolutely" care if Fowler's $5 million came into New Swift, (*Id.* at 547), that he "cared that the money showed up," (*Id.* at 549), that "[Burdette's] intent was to insure, and [he] made sure that was represented throughout the process, that they were going to get an infusion of $5 million, whatever vehicle they used to get it in," (*Id.* at 551). Taken together, these statements support the finding that Burdette knew New Swift needed the $5 million and he was the person at Swift responsible for ensuring that money came in as part of the Transaction. Thus, the Bankruptcy Court's finding is supported by the record,

and the Court overrules this objection.

> **11.** **"As to the cost of the 801 and 802 leases ($235,000 per month), Burdette noted the Buyers needed these planes and were willing to overpay for the privilege of using them."**

Defendants object to the Bankruptcy Court's finding that the Buyers needed the Transjet planes and were willing to overpay for them, arguing that "this finding also has no basis in the evidentiary record." (Doc. 1 at 21). Burdette testified, however, that the Buyers needed the Transjet planes to carry out their business plan, that Transjet could have taken its planes and leased them to somebody else, and that, without the Transjet planes, the Buyers would have to go through the regulatory process with the FAA of adding new planes to New Swift's Part 121 Certificate. (Doc. 19-3 at 670–72). Thus, the record shows that the Buyers needed the planes at issue and would likely be willing to overpay for them to avoid the cost and delay of adding new planes to New Swift's Part 121 Certificate. Therefore, the Bankruptcy Court's finding is supported by the record, and the Court overrules this objection.

> **12.** **"Ehrlich was directed to SAG's 2011 tax return where it noted a $4,510,000 plane and that, 'due to financial hardship and insolvancy [sic], the taxpayer could not take delivery of the aircraft . . . the taxpayer took a deduction on 12/21/2011 on Form 4797.' Ehrlich confirmed that the 'insolvancy' reference was to book value insolvency, not market value. Moreover, the pass-through losses could not be promptly utilized by Moyes because he already had significant passive losses . . . This exchange highlights for the Court that, while Moyes was not in a position to promptly shield income from the passive losses triggered by the Transaction, Moyes nevertheless was able to recognize a significant tax benefit at the time of the Transaction."**

Defendants object to the Bankruptcy Court's finding that a $4,510,000 loss on a

plane was related to the Transaction and the Bankruptcy Court's discussion of "tax benefits" related to Moyes. (Doc. 1 at 22). Defendants argue that there was "no evidence whatsoever that the $4,510,000 loss on a plane was related in any way to Swift or the Transaction," and that the "Trustee never introduced any evidence regarding, and the [Bankruptcy] Court made no definitive findings with respect to, any 'tax benefits' related to Moyes." (*See id.*). To begin, when testifying about the $4,510,000 loss, Ehrlich stated that SAG's 2011 tax return may have been related to other SAG affiliates, namely Sales, and that the deduction in question was taken on the Transaction Date. (*See* Doc. 19-3 at 928–29). Thus, the record supports an inference that the $4,510,000 loss was related to Swift and the Transaction.

In addition, Ehrlich testified that the tax benefits of the losses "would flow through to Mr. Moyes." (*Id.* at 930). The Bankruptcy Court also made specific findings about these benefits and their flow to Moyes based on the record in Part VII(C)(7)(k) of its Report and Recommendation. (*See* Doc. 19-2 at 223). Thus, the record supports the Bankruptcy Court's finding that Moyes could realize the tax benefits of the $4,510,000 loss. Because the findings of the Bankruptcy Court were supported by the record, the Court overrules this objection.

> **13.** **"On the Transaction Date one could make a case for the proposition that Swift was on its 'death bed' but neither of the parties have invited the Court to make this determination nor will the Court *sua sponte* make such a finding."**

Defendants object to the Bankruptcy Court's failure to make a finding that Swift was on its "death bed" on the Transaction Date arguing that the Bankruptcy Court failed to treat Swift as a going concern despite this finding. (Doc. 1 at 22–23). The Bankruptcy Court, however, treated Swift as a going concern in its insolvency analysis. (*See, e.g.,* Doc. 19-2 at 150); *see also Redeye II, LLC v. MorrisAnderson & Associates Limited*, Case No. CV-20-00855-PHX-JAT, Part III.D.1 (D. Ariz. Dec. 1, 2020). Thus, this objection is without merit and the Court overrules it.

14. **"Whether the SAVM Receivable was collectible on the Transaction Date is irrelevant for the purposes of this Court's preference analysis. The SAVM Receivable was transferred to SAG and then to Moyes. This transfer resulted in a pay down of the Moyes Note. Moyes' books also reflect that the SAVM Note to Moyes was increased by the exact amount of the SAVM Receivable. The value of the SAVM Receivable was recognized by Moyes to be the full amount of the SAVM Receivable. If the SAVM Note was ultimately uncollectible, the [Bankruptcy] Court presumes (but does not affirmatively find) that Moyes wrote off this bad debt for his tax purposes. What the [Bankruptcy] Court does find is that Moyes enjoyed the full amount of the SAVM Receivable when that asset was transferred to him."**

Defendants object to the Bankruptcy Court's finding that the SAVM receivable was collectable arguing that SAVM was out of business and could not have paid the SAVM receivable on the Transaction Date, so its market value was $0, rather than its face value. (Doc. 1 at 23–24). It is true that SAVM had no assets on their books and was not operating at the time of the Transaction. (Doc. 19-3 at 389, 209) However, Swift never treated the SAVM Receivable as uncollectable by writing it down in their books, and there was no evidence of any effort made by Swift to collect this receivable. (Doc. 19-3 at 265–67).

Additionally, the representative for SAG, the parent of SAVM, testified that the SAVM Receivable was a collectable asset because Moyes would "make it good." (Response Brief, Appendix Tab 9 at 137–38, *Redeye II, LLC v. MorrisAnderson & Associates Limited*, Case No. CV-20-00855-PHX-JAT (D. Ariz. Dec. 1, 2020), ECF No. 25-10). Burdette similarly testified that Moyes "funded" certain of his companies to "help[] them out" when they could not make payments that were due. (Doc. 19-3 at 409–10). Moyes also testified that he and his companies "had to pay [their] payables," (Doc. 19-2 at 1055), and that he would loan money to pay debts owed by, at least one of, his companies,

(*see id.* at 1067). The record reflects that Moyes was no stranger to loaning money to his companies so they could satisfy their payables.

Further, the record reflects that Moyes realized at least the full face value of the SAVM Receivable. (*See* Doc. 19-3 at 1234 ("The amount of the SAVM Receivable was added to the balance due under a promissory note from SAVM to Moyes."); Doc. 19-5 at 2 (showing that after the transfer of the SAVM Receivable to Moyes, the Swift note payable to Moyes was satisfied)). This evidence together supports the finding that the SAVM Receivable was collectable, and the Court overrules this objection.

> **15.** **"On the Transaction Date, the balance on the Moyes Note totaled $4,762,360. *See* FN 58. The Moyes Note was paid off as part of the Transaction."**

Defendants object to the Bankruptcy Court's finding that the Moyes promissory note with Swift (the "Moyes Note") was paid off as a part of the Transaction arguing that it was not paid, but simply taken as a loss. (Doc. 1 at 24). Yet, the record shows that, as a part of the Transaction, the SAVM Receivable was transferred to Moyes, *see supra* Section III.A.14, at the same time the balance of the Moyes Note was set to $0, (*see* Doc. 19-5 at 2). Thus, the record supports the Bankruptcy Court's finding that the SAVM Receivable was used to pay off the Moyes Note, and the Court overrules this objection.

> **16.** **The Bankruptcy Court found that the Defendants did not act with actual intent to hinder, delay, or defraud because they satisfied their burden to establish a "legitimate supervening purpose."**

Defendants object to the Bankruptcy Court's failure to find that the evidence surrounding a finding of legitimate supervening purpose in the intentional fraudulent transfer analysis did not also prove that there was no breach of fiduciary duty by the Defendants. (Doc. 1 at 24–25). Defendants state that they "do not object to the [Bankruptcy] Court's ultimate legal conclusion that the Transaction served a 'legitimate supervening purpose.'" (*Id.* at 25). Instead, Defendants seem to object to the exclusion of additional evidence surrounding this finding which Defendants assert would prove that

they satisfied their fiduciary duties. (*See id.*). As discussed *infra*, the Court affirms the Bankruptcy Court's proposed conclusions of law relating to the fiduciary duty claims, *see infra* Section III.C.2, so the Court overrules this objection.

> **17.** **"Given that the Arizona Supreme Court determined members and managers of Swift owed common law fiduciaries duty [sic] to Swift, the question is whether Moyes and Burdette owed fiduciary duties to Swift up to an including the time of the Transaction. At this Court's July 2, 2019 hearing, their counsel conceded they did."**

Defendants object to the Bankruptcy Court's finding that *In re Sky Harbor Hotel Properties, LLC*, 443 P.3d 21 (Ariz. 2019), determined members and managers of Swift owed common law fiduciary duties to Swift and that Defendants conceded that Moyes and Burdette owed fiduciary duties to Swift. (Doc. 1 at 26–27). Defendants argue that Swift's operating agreement (the "Operating Agreement") eliminated these fiduciary duties for Moyes and Burdette. (*See id.*). First, the *In re Sky Harbor* court held that "an LLC's managers or members, when acting as agents of the LLC, owe fiduciary duties to the company," and that "these duties may be lawfully limited by a valid operating agreement." *In re Sky Harbor*, 443 P.3d at 24. Because Swift was an LLC, managers or members of Swift would necessarily owe Swift fiduciary duties.

Next, at the July 2, 2019 hearing, Defendants conceded that Moyes and Burdette "admittedly, pursuant to the Arizona Supreme Court, [] had a fiduciary duty coming into the transaction." *See* Transcript of Hearing or Trial on 7/2/19, *In re Swift Air, L.L.C.*, No. 14-AP-00534, at 21–22 (Bankr. D. Ariz. July 11, 2019), ECF No. 535.[4]

---

[4] The full text of the hearing excerpt reads:
> THE COURT: So stepping back a little bit, the whole reason we're talking about 7.10 is because Moyes and Burdette are saying I am exonerated from what I did in this matter under 7.10. The company has no claims against me under 7.10, because admittedly, pursuant to the Arizona Supreme Court, I had a fiduciary duty coming into the transaction, but I had the safety net of knowing that as long as I acted in good faith, 7.10's going to protect me, and there will be no such thing as a breach of fiduciary duty claim against me.
> MR. SALERNO: As long as I did not commit intentional fraud.
> THE COURT: Right.

1    Finally, the Bankruptcy Court correctly determined that the Operating Agreement

2 did not eliminate the fiduciary duties owed by Moyes and Burdette. *See infra* Section

3 III.C.1. Thus, the Bankruptcy Court's finding is supported by the record, and the Court

4 overrules this objection.

5        **18.    The Bankruptcy Court found that Moyes and Burdette were not**

6            **"Officers" of Swift for purposes of the Operating Agreement.**

7    Defendants object to the Bankruptcy Court's finding that Moyes and Burdette were

8 not "Officers" of Swift for purposes of the Operating Agreement. (Doc. 1 at 27). The

9 Bankruptcy Court found that Moyes and Burdette were not "Officers" under the Operating

10 Agreement because the Operating Agreement contains both the terms "officer" and

11 "Officer" and the term "Officer" is "a capitalized word signifying it must have a particular

12 meaning within the context of the Operating Agreement." (Doc. 19-2 at 206–07). The

13 Operating Agreement does not define the term "Officer," so the Bankruptcy Court would

14 "not presume the word "Officer" provides Moyes and Burdette the protections of ¶ 7.10

15 [the Operating Agreement's indemnity provision]." (*Id.* at 207).

16    The Operating Agreement uses both the term "officer" and "Officer" throughout its

17 text. *See* Statement of Facts in Support of Motion for Report and Recommendation, Exhibit

18 A, *In re Swift Air, L.L.C.*, No. 14-AP-00534, at 6–18 (Bankr. D. Ariz. April 10, 2018), ECF

19 No. 271-2. Notably, ¶ 6.11 which establishes the officers of Swift and lays out their

20 responsibilities uses both "officer" and "Officer" seemingly interchangeably. *See id.* at 13.

21 Similarly, ¶ 7.10 also uses both "officer" and "Officer" seemingly interchangeably. *See id.*

22 at 15.

23    The Operating Agreement, by its terms, is governed by Arizona Law; and the parties

24 do not dispute that Arizona law controls. *Id.* at 17. Under Arizona law, "[w]hether a

25 contract is ambiguous is a question of law." *Hartford v. Indus. Comm'n of Arizona*, 870

26 P.2d 1202, 1207 (Ariz. Ct. App. 1994). "Language is ambiguous when it can reasonably

27 be construed in more than one sense and such construction cannot be determined within

28

MR. SALERNO: That's what it – then yes . . . .

- 18 -

the four corners of the instrument." *Univ. Realty & Dev. Co. v. Omid-Gaf, Inc.*, 508 P.2d 747, 750 (Ariz. App. Ct. 1973). "Any ambiguity is subject to a factual determination concerning the intent of the parties and is to be resolved conclusively by the trier of fact." *Hartford*, 870 P.2d at 1207. The language of the Operating Agreement is ambiguous as a matter of law because whether the term "Officer" is a defined term separate from "officer" can be construed in more than one sense when looking within the four corners of the Operating Agreement. Thus, whether the term "officer" is different from the term "Officer" in the Operating Agreement is a question of fact.

Here, the Court finds that the term "Officer" should not be considered a separate defined term from "officer." Both terms are used interchangeably at key parts of the Operating Agreement, and the Operating Agreement does not define a separate "Officer" term. Thus, the Court sustains this objection to the Bankruptcy Court's proposed factual findings.

> **19.    "At trial, Burdette testified that Buyers were in a hurry to close the Transaction but the Seller was not. The Court finds this testimony not credible. Swift was crippled and needed to be sold or quickly closed."**

Defendants object to the Bankruptcy Court's finding that Burdette was not credible in his testimony that Seller was not in a hurry to close the Transaction and that Swift was crippled and needed to be sold quickly or closed arguing there is no affirmative evidence to support such a finding. (Doc. 1 at 28). Yet, the record shows that, leading up to the Transaction, Burdette and Moyes decided to enter into the Transaction or have Swift cease operations. (Doc. 19-2 at 88 (*citing* Declaration of Kevin Burdette at 5, *In re Swift Air, L.L.C.*, No. 14-AP-00534 (Bankr. D. Ariz. Mar. 22, 2018), ECF No. 258-3)). Additionally, Burdette testified that the SAG companies were suffering from what Burdette described as a "zombie apocalypse financial collapse," in which "[p]eople stopped flying airplanes." (*Id.* at 1086). Thus, the record supports the Bankruptcy Court's finding that Burdette and Moyes were eager to quickly close the Transaction and that Swift was crippled and needed

to be sold or closed, so the Court overrules this objection.

> **20.**   **"Why would [Defendants] not insist on the merger [of Direct Air and Swift]? Presumably the Buyers balked at the merger and neither Moyes nor Burdette saw fit to look out for Swift's best interests."**

Defendants object to the Bankruptcy Court's findings that the Buyers may have balked at the merger of Swift and Direct Air and that Moyes and Burdette were not looking out for Swift's best interest by failing to insist on the merger arguing that no evidence supports such a finding and a merger with Direct Air may not have been beneficial for Swift. (Doc. 1 at 28). The evidence does, however, suggest that the Direct Air merger was initially intended to be a part of New Swift's post-Transaction plans. Burdette testified that part of the Buyers' business plan involved Direct Air from the outset of the Transaction. (*See* Doc. 19-3 at 544). Ehrlich also noted that he understood the merger with Direct Air to be a requirement for the Transaction and that it would bring additional equity into Swift. (*See* Doc. 19-2 at 93 (citing Trial Exhibit 066, November 29, 2011, Memorandum from Ehrlich to Burdette)). Burdette's testimony further highlighted the importance of the Direct Air merger, even stating that Direct Air was the "piece of the puzzle that [Swift] needed," and that Direct Air "needed to be [Swift's] next customer." (Doc. 19-3 at 669).

Because the Direct Air merger was such an important piece of the Transaction for Swift, and because the Direct Air merger was initially intended to be a part of New Swift's post-Transaction plans, the record supports the inference that the Buyers were the ultimate reason the Direct Air merger did not occur. Thus, the Bankruptcy Court's finding is supported by the record and the Court overrules this objection.

> **21.**   **"The $1,802,668 owed to Swift by the Transjet Subsidiaries could also not be paid in cash just before the Transaction Date because any money obtained by the Transjet Subsidiaries came from Swift's operations or in the form of loans from Moyes."**

Defendants object to the Bankruptcy Court's finding that the Transjet Subsidiaries

could not pay their payables and that the Transjet Subsidiaries obtained their money from Swift's operations or from loans by Moyes. (Doc. 1 at 28–29). Defendants argue that Transjet performed all bookkeeping and handled payments for the Transjet Subsidiaries and that the Transjet payables were customarily setoff against Transjet receivables. (*See id.*). To begin, even if Transjet performed all the bookkeeping and handled payments for the Transjet Subsidiaries, the payments owed to Swift stemmed from Swift's management agreements with the Transjet Subsidiaries (the "Management Agreements"), not any agreement Transjet itself. (*See* Doc. 19-8 at 25–100).

Further, while Defendants argue that Transjet's payables and receivables with Swift were normally setoff against each other at the end of each month, the Management Agreements specifically disallowed setoff and required payment be made in cash. (*See, e.g., id.* at 33). This term was not waived or modified by any party, so Defendants' argument of setoff is unavailing. *See Transjet Incorporated v. MorrisAnderson & Associates Limited*, Case No. CV-20-00849-PHX-JAT, Part III.B (D. Ariz. Dec. 1, 2020). Thus, the Bankruptcy Court's finding is supported by the record, and the Court overrules this objection.

> **22.** **"In effect, Moyes' business interests were served by the SAVM Receivable because SAVM ran up debts with Swift but never had to pay them. Were the SAVM Receivable not incurred, either SAVM would have failed earlier or Moyes would likely have needed to inject even more funding into SAVM."**

Defendants object to the Bankruptcy Court's finding that Moyes's business interests were served by the SAVM receivable and that SAVM would have failed earlier or needed a cash injection from Moyes if the SAVM receivable were not allowed to accrue. (Doc. 1 at 29–30). Defendants argue that Moyes's and SAVM's interests were separate and the SAVM receivable was a wash for Swift because both SAVM and Swift had the same parent, SAG. (*See id.*). SAVM was a separate entity from Moyes and had its own individual interests. SAVM, however, was ultimately owned by the Moyes Trust, and Moyes had

loaned at least $11 million to SAVM to help SAVM through difficulties. (*See* Doc. 19-3 at 206–07). So, the record shows that Moyes had a business interest in the success of SAVM.

Additionally, although SAVM and Swift shared SAG as a corporate parent, SAVM and Swift were separate business entities. Debts owed by SAVM to Swift were not automatically satisfied because of their common parent SAG. Because of this, the SAVM Receivable owed to Swift benefited SAVM, and by extension Moyes, by allowing SAVM to accrue debt without having to pay it during difficult financial times. Thus, the record supports the Bankruptcy Court's finding, and the Court overrules this objection.

23. **". . . it is also obvious to the Court that Moyes was served by spinning Swift's 135 Business off to SAM. Moyes needed a 135 certificate for use in his executive travel, especially through Redeye."**

Defendants object to the Bankruptcy Court's finding that Moyes was served by spinning off the Part 135 Business because he needed the Part 135 Business for his executive travel. As discussed *supra*, the record supports this finding by the Bankruptcy Court and the Court overrules this objection. *See supra* Section III.A.1.

24. **"The Transaction called for New Swift to lease both of those planes, not based on known market price but rather, simply based on the amount of Transjet's monthly debt service."**

Defendants object to the Bankruptcy Court's finding that the leases of Transjet's planes to Swift were not based on market price but the amount of Transjet's monthly payments for these planes. (Doc. 1 at 30–31). Yet, Burdette's testimony supports exactly the finding of the Bankruptcy Court on this issue. (*See* Doc. 19-3 at 626–27). Thus, the Court overrules this objection.

25. **The Bankruptcy Court found that Moyes was motivated to have New Swift pay the lease debt he guaranteed with respect to the Transjet planes.**

Defendants object to the Bankruptcy Court's finding that Moyes was motivated to

have New Swift pay the lease debt Moyes guaranteed with respect to Transjet's planes arguing that there is no evidence that Moyes was so motivated and that the Buyers wanted to make the lease payments. (Doc. 1 at 31). Regardless of whether the Buyers wanted to make the lease payments in question, Moyes was certainly motivated to have the Transjet leases paid because he personally guaranteed them. (*See* Doc. 19-3 at 631–32). As Swift was the only source of revenue for the Transjet Subsidiaries, (*See* Doc. 19-2 at 218), Moyes would be motivated to have New Swift continue providing revenue to the Transjet Subsidiaries so that the lease payments could be made. Thus, the record supports the Bankruptcy Court's finding, and the Court overrules this objection.

> 26. **"Moyes' entity Transpay was benefited by this arrangement and, at least emotionally, Moyes benefitted from knowing his people would still have jobs after the Transaction closed. The alternative to this sale was closing Swift and laying off many longtime employees employed by the Moyes Entities."**

Defendants object to the Bankruptcy Court's finding that Moyes benefitted, at least emotionally, from the Transaction because Transpay's employees would still have jobs and that the alternative to the Transaction was closing Swift. (Doc. 1 at 31–32). Swift had no employees of its own and leased employees from Transpay to operate its charter business. (*See* Doc. 19-2 at 82). Transpay was wholly owned by Moyes who was also Transpay's president. (*See id.*). It is a reasonable inference to determine that Moyes, as Transpay's president, would benefit, at least emotionally, from Swift continuing to lease employees from Transpay so that Transpay would not have to lay off any of these employees.

Further, the evidence shows that Swift's liabilities were significantly in excess of its assets. (*See* Doc. 19-5 at 75). Even if Swift's financial downturn was due, in part, to the 2011 NBA strike, Swift's fortunes had yet to change at the time of the Transaction. Additionally, Moyes testified that he sold Swift based on Burdette's recommendation and did not even know the details of the Transaction. (Doc. 19-2 at 1066). So even if Moyes could have supported Swift moving forward, he likely would not have done so due to

Burdette's recommendation. This coupled with the fact that Burdette stated that he and Moyes decided to enter into the Transaction or have Swift cease operations shows that the Bankruptcy Court's finding is amply supported by the record. (*Id.* at 88 (*citing* Declaration of Kevin Burdette at 5, *In re Swift Air, L.L.C.*, No. 14-AP-00534 (Bankr. D. Ariz. Mar. 22, 2018), ECF No. 258-3)). Thus, the Court overrules this objection.

> **27.    "This new lease arrangement held out the prospect that Services could survive and that Moyes' corporate jet travel needs could be handled through the continued survival of Services. Absent the Transaction Swift would shut down and Services' operations supporting Moyes' private jet transportation would have been in grave jeopardy."**

Defendants object to the Bankruptcy Court's finding that New Swift's lease arrangement with Services would allow Services to survive and that Services supported Moyes's private jet transportation arguing that there "is no basis in the evidentiary record . . . for this finding." (Doc. 1 at 32). Yet, Burdette testified to the scope of Services' operations and the importance of Swift remaining a customer of Services'. (*See* Doc. 19-3 at 661). It is a reasonable inference to find that the loss of such an important customer would jeopardize Services' business.

Additionally, as noted *supra*, Moyes utilized the Part 135 Business to operate his private aircraft. *See supra* Section III.A.1. Because Services provided facilities and services for the Part 135 Business, any interruption of Services' business would jeopardize Moyes's private travel as well. Thus, the Court overrules this objection.

> **28.    ". . . the fact that Moyes and Burdette allowed Legacy to build up such a large receivable over many years evidences their domination of Swift as a manner designed to suit Moyes' personal interests, not the best interests of Swift."**

Defendants object to the Bankruptcy Court's finding that Moyes and Burdette allowing the Legacy Aircraft Partners, LLC ("Legacy") receivable owed to Swift (the

"Legacy Receivable") to build up and then be transferred to Moyes evidences Moyes use of Swift for his own interests. (Doc. 1 at 32). Defendants argue that there is no evidence of who controlled Legacy, why the Legacy Receivable built up, or what the final disposition of the receivable was. (*See id.*). Yet, the Bankruptcy Court found that Legacy was owned and controlled by Moyes, and this is supported by Legacy's public records. (*See* Doc. 19-2 at 84); *see also* Defendants' Objection to Trustee's Motion for Leave to File Fourth Amended Complaint, Exhibit A–E, *In re Swift Air, L.L.C.*, No. 14-AP-00534, at 17 (Bankr. D. Ariz. June 14, 2018), ECF No. 303-2 (Showing that Arizona Corporation Commission records list Jerry Moyes as Manager of Legacy).

Additionally, Moyes testified that payables and receivables for Moyes owned companies did not "get the attention" that accounts with unrelated companies got because they "[were] just interrelated companies." (Doc. 19-2 at 1054). So, it was a reasonable inference based on the record for the Bankruptcy Court to find that the Legacy Receivable was allowed to build up because Legacy was a Moyes owned company, rather than because letting the Legacy Receivable build up was good for Swift. In fact, there is no evidence in the record suggesting that it was beneficial to Swift to allow the Legacy Receivable to significantly build up.

Finally, the record shows a transfer of the Legacy receivable from Swift to Moyes in 2011 to reduce Swift's financial obligation to Moyes. (*See* Doc. 19-8 at 318). Thus, the Bankruptcy Court's finding is supported by the record, and the Court overrules this objection.

### 29. The Bankruptcy Court found that Moyes "possibly" had liability on the Transportation Taxes as a control party.

Defendants object to the Bankruptcy Court's finding that Moyes possibly had liability on Swift's unpaid transportation taxes (the "Transportation Taxes") arguing that "[t]here is no evidence on record related to whether Moyes had control party liability for the Transportation Taxes." (Doc. 1 at 32–33). However, the record establishes that Burdette may have had liability for the Transportation Taxes as Swift's vice-president, (*See* Doc.

19-3 at 159–60, 589), so it is a reasonable inference to find that Moyes may have also had liability for the Transportation Taxes as Swift's president. Thus, the Court overrules this objection.

> **30.     "As it turns out, New Swift carried many of these unpaid debts into its Chapter 11 Proceeding."**

Defendants object to the Bankruptcy Court's finding that New Swift carried many pre-transaction payable debts into its Chapter 11 proceeding arguing that "[t]he Trustee never presented any evidence at trial that would allow the [Bankruptcy] Court to make a determination as to the amount of Swift's unsecured debts on the Petition Date that had been unpaid since the time of the Transaction." (Doc. 1 at 33). To be sure, the Trustee did not trace the exact amount of pre-Transaction debt that Swift carried into its Chapter 11 proceeding, (*see id.* at 107), but the Bankruptcy Court did not purport to make such a finding. Instead, the Bankruptcy Court found that New Swift did not have the cash on hand to pay its pre-Transaction debts. (*See* Doc. 19-2 at 223). Because of this, the fact that Moyes and Burdette did not require Swift's pre-Transaction debts be paid as a part of the Transaction caused financial strain for Swift which it endured into its Chapter 11 proceeding. (*See* Doc. 19-2 at 223). Such a finding is supported by the record, so the Court overrules this objection.

> **31.     "In the year prior to the Transaction, millions of dollars were paid from SAVM to Moyes in reduction of SAVM's liabilities to Moyes or to creditors whose claims Moyes guaranteed. These transfers rendered SAVM incapable of paying Swift on the SAVM Receivable. As of the Transaction Date, the SAVM Receivable was uncollectible and SAVM was defunct. By gutting SAVM of its cash, Moyes and Burdette ensured that SAVM could not pay its bills to Swift."**

Defendants object to the Bankruptcy Court's finding that, prior to the Transaction, Moyes was paid millions of dollars from SAVM which rendered SAVM incapable of

paying Swift on the SAVM receivable on the Transaction Date. (Doc. 1 at 33–34). Defendants argue that the evidence shows Moyes putting millions of dollars into SAVM and that market forces, not Moyes, caused SAVM to not be able to pay Swift. (*See id.*). The record, however, supports the Bankruptcy Court's finding.

SAVM's December 31, 2010, balance sheet shows cash in checking at $10,718,557.30 and liabilities to Swift at $4,599,781.61. *See* Trustee's Post-Trial Closing Brief, Appendix App. No. 25, *In re Swift Air, L.L.C.*, No. 14-AP-00534, at 17 (Bankr. D. Ariz. Apr. 5, 2019), ECF No. 521-27. This balance sheet also shows that SAVM had liabilities in excess of $31 million, including over $11 million owed to creditors unaffiliated with Moyes. *Id.* Some of these debts to outside creditors were guaranteed by Moyes. (Doc. 19-3 at 390).

SAVM's March 31, 2011, balance sheet shows cash in checking at $296.65 and liabilities to Swift at $4,516,400.44. *See* Trustee's Post-Trial Closing Brief, Appendix App. No. 25, *In re Swift Air, L.L.C.*, No. 14-AP-00534, at 17 (Bankr. D. Ariz. Apr. 5, 2019), ECF No. 521-27. This balance sheet also shows that SAVM had liabilities in excess of $20 million, including only $327,752.99 owed to creditors unaffiliated with Moyes. It is a reasonable inference to find that the payment of debt to outside creditors, at least some of which was guaranteed by Moyes, depleted SAVM's cash stores and rendered it incapable of paying Swift.

While the economic downturn in 2008 likely hurt SAVM's business, the record supports a finding that SAVM's use of cash to pay outside creditors left SAVM incapable of paying what it owed to Swift. As the president and vice-president of SAVM, Moyes and Burdette were certainly involved with the decision to direct SAVM's cash away from Swift. Thus, the Court overrules this objection.

> **32.** **"Ehrlich knew the questions of Swift's solvency was [sic] a cloud hanging over the Transaction but did not obtain or even suggest Swift obtain an expert's opinion of Swift's solvency . . ."**

Defendants object to the Bankruptcy Court's finding that Ehrlich knew the questions

of Swift's solvency hung over the Transaction but did not obtain or suggest Swift obtain an expert's opinion on Swift's solvency. (Doc. 1 at 34). Defendants argue that there is no basis for this finding in the record, a solvency opinion was not required for the Transaction, and Ehrlich testified that he did not believe a breach of fiduciary duty was being committed through the Transaction. (*See id.*). To begin, the parties do not dispute that Swift was insolvent on a book value basis on the Transaction Date, (*See* Doc. 19-2 at 88), and the record shows that Swift had "always had losses," (*id.* at 93 (citing Trial Exhibit 066, November 29, 2011, Memorandum from Ehrlich to Burdette)). Ehrlich also asserted that Swift needed to ensure that the Buyers were adequately capitalized to be able to succeed post-Transaction due to Swift's precarious financial position. (*See id.* at 94). It is reasonable to infer from this evidence that Ehrlich knew that Swift's solvency was a question hanging over the Transaction.

Further, there is no evidence that Ehrlich ever obtained or suggested Swift obtain an expert's opinion on Swift's solvency. Thus, the Bankruptcy Court's finding is supported by the record, and the Court overrules this objection.

### B.     Objections to Omissions of Fact

In addition to contesting the Bankruptcy Court's proposed findings of fact, Defendants argue that the Bankruptcy Court disregarded evidence without explanation in contravention of Ninth Circuit precedent. (Doc. 1 at 15). After considering the parties' submissions, the record evidence, and the proposed findings of fact by the Bankruptcy Court, the Court finds that the additional factual findings proposed by Defendants are either not relevant, not supported by the evidence, or were considered by the Bankruptcy Court in making its proposed findings of fact. Thus, the Court overrules each of the objections made by Defendants regarding factual omissions and will address each objection in turn.

### 1.     Pre-Transaction Historic Financial Condition

Defendants assert that the Bankruptcy Court should have made a finding that Swift had positive retained earnings for 2008–2010. (*Id.* at 35). The Bankruptcy Court made such a finding when it discussed Swift's financial statements before the Transaction. (*See* Doc.

19-2 at 95–96). Thus, Defendants' objection is without merit and the Court overrules it.

### 2. Viability of Part 121 Business

Defendants assert that the Bankruptcy Court should have made a finding that the Part 121 Business was viable in 2009 and offset Swift's losses from the Part 135 Business. (Doc. 1 at 35). The Bankruptcy Court discussed Swift's financial statements from 2007–2011, and the viability of the Part 121 Business in 2009 is not relevant to the instant issues. Thus, a finding as to the viability of Swift's Part 121 Business in 2009 would not change the ultimate analysis of the instant issues, and the Court overrules this objection.

### 3. Primary Cause of 2011 Adverse Operations

Defendants assert that the Bankruptcy Court should have made a finding that the primary cause of Swift's negative retained earnings in 2011 was the 2011 NBA strike. (Doc. 1 at 35). The Bankruptcy Court found that the 2011 NBA strike impacted Swift's operations. (Doc. 19-2 at 88). Even after the 2011 NBA strike ended, though, records show that New Swift continued losing money while holding NBA contracts. *See* Response Brief, Appendix Tab 6 at 2–18, *Redeye II, LLC v. MorrisAnderson & Associates Limited*, Case No. CV-20-00855-PHX-JAT (D. Ariz. Dec. 1, 2020), ECF No. 25-7. Additionally, New Swift ultimately emerged from bankruptcy after "shedding numerous unfavorable customer contracts." (Doc. 19-2 at 177). Thus, the Bankruptcy Court's findings regarding Swift's customer contracts and operations are well supported by the record, and the Court overrules this objection.

### 4. No Affirmative Marketing of Swift

Defendants assert that the Bankruptcy Court should have made a finding that Swift was not affirmatively marketed for sale. (Doc. 1 at 35). Such a finding would not change the fact that Burdette and Moyes decided to either enter into the Transaction or have Swift cease operations. (Doc. 19-2 at 88 (*citing* Declaration of Kevin Burdette at 5, *In re Swift Air, L.L.C.*, No. 14-AP-00534 (Bankr. D. Ariz. Mar. 22, 2018), ECF No. 258-3)). Whether Moyes was marketing Swift or not, he ultimately decided to sell Swift's Part 121 Business. Thus, Defendants' objection is without merit and the Court overrules it.

### 5.   Seller's Timing

Defendants assert that the Bankruptcy Court should have made a finding that Moyes was "in no hurry to do a sale." (Doc. 1 at 35). Yet, the record shows that, leading up to the Transaction, Burdette and Moyes decided to either enter into the Transaction or have Swift cease operations. *See supra* Section III.B.4. Thus, the record does not support a finding that Moyes was in no hurry to do a sale, and the Court overrules this objection.

### 6.   Buyers' Control of Timing

Defendants assert that the Bankruptcy Court should have made a finding that the Buyers dictated the timing and closing of the Transaction. (Doc. 1 at 35). Regardless of who dictated the timing of the Transaction, the Transaction's timing fit Moyes's needs perfectly as he had decided to either enter into the Transaction or have Swift cease operations. *See supra* Section III.B.4. Thus, such a finding would not change the ultimate analysis of the instant issues, and the Court overrules this objection.

### 7.   No Enrichment by Burdette

Defendants assert that the Bankruptcy Court should have made a finding that Burdette was not enriched by the Transaction. (Doc. 1 at 36). The Bankruptcy Court made a finding that Burdette "did not financially benefit" from any breaches of fiduciary duty associated with the Transaction. Thus, this objection is without merit and the Court overrules it.

### 8.   Buyers' Legal Counsel/Role

Defendants assert that the Bankruptcy Court should have made a finding that the Buyers, through their counsel, provided Ehrlich with a proposed draft of the sale agreement that governed the Transaction. (Doc. 1 at 36). It is not clear how such a finding would be relevant to the instant issues as Defendants ultimately signed off on the terms of the Transaction, so the Court overrules this objection as irrelevant.

### 9.   Buyers' Drafting of Operative Documents

Defendants assert that the Bankruptcy Court should have made a finding that the agreements related to the Transaction were executed with the Buyers' and Defendants'

representatives on opposite sides. (Doc. 1 at 36). The Bankruptcy Court made findings that the Transaction was made at arm's length, (*see* Doc. 19-2 at 169–70), Ehrlich served as council for Moyes and Swift in the Transaction, (*see id.* at 143–44), and the Buyers' council prepared drafts for and represented the Buyers in the Transaction, (*See id.* at 144). Thus, such a finding would not add to the ultimate analysis of the instant issues, so the Court overrules this objection.

### 10.    New Swift Signed Releases

Defendants assert that the Bankruptcy Court should have made a finding that New Swift's representative signed the Assignment and Assumption Agreement. (Doc. 1 at 36). The Bankruptcy Court made such a finding when describing the documents that were part of the Transaction. (*See* Doc. 19-2 at 102). Thus, this objection is without merit and the Court overrules it.

### 11.    Resignation of Managing Member

Defendants assert that the Bankruptcy Court should have made a finding that, on the Transaction Date, SAVM resigned as Manager of Swift and the Buyers took over full control of Swift. (Doc. 1 at 36). The Bankruptcy Court found that the Buyers took 100% ownership of Swift in the Transaction and that SAVM was "then defunct" at the time of the Transaction. (*See* Doc. 19-2 at 97). The Bankruptcy Court also found that SAVM resigned as Swift's manager. (*See id.* at 104). Thus, this objection is without merit and the Court overrules it.

### 12.    Transfer of 135 Business Assets/Liabilities

Defendants assert that the Bankruptcy Court should have made a finding that Swift transferred certain assets and liabilities associated with the Part 135 Business to SAVM and SAG pursuant to the Assignment and Assumption Agreement. (Doc. 1 at 36). The Bankruptcy Court found that the Assignment and Assumption Agreement was part of the Transaction and that certain Swift assets and liabilities moved through SAG and SAVM in connection with the Transaction. (*See* Doc. 19-2 at 97–98, 102). Thus, this objection is without merit and the Court overrules it.

1    ### 13.    New Swift Execution of Documents

2        Defendants assert that the Bankruptcy Court should have made a finding that the

3    Buyers agreed to the Assignment and Assumption Agreement and the Settlement

4    Agreement. (Doc. 1 at 36). The Bankruptcy Court made such a finding when describing

5    the documents associated with the Transaction. (*See* Doc. 19-2 at 101–02). Thus, this

6    objection is without merit and the Court overrules it.

7    ### 14.    No Money to Moyes/Burdette

8        Defendants assert that the Bankruptcy Court should have made a finding that neither

9    Burdette nor Moyes received any money or consideration personally from the Transaction,

10   and that neither individual received a salary from Swift, Services, SAVM, or Sales. (Doc.

11   1 at 36–37). The record, however, shows that Moyes realized, at least, the full value of the

12   SAVM receivable in connection with the Transaction. (*See* Doc. 19-3 at 1234 ("The

13   amount of the SAVM Receivable was added to the balance due under a promissory note

14   from SAVM to Moyes."); Doc. 19-5 at 2 (showing that after the transfer of the SAVM

15   Receivable to Moyes, the Swift note payable to Moyes was satisfied)). Further, it is not

16   clear how a finding regarding the salaries of Moyes and Burdette would impact the analysis

17   of the instant issues. Thus, the Court overrules this objection.

18   ### 15.    Adequate Due Diligence by Burdette

19       Defendants assert that the Bankruptcy Court should have made a finding that

20   Burdette conducted adequate due diligence before the Transaction. (Doc. 1 at 37). Yet,

21   Burdette testified that the due diligence he conducted was simply having conversations

22   with the Buyers and reviewing only a "basic business model," which at the time of his

23   testimony Burdette could not even recall. (*See* Doc. 19-3 at 542–43). Burdette testified that

24   he did not review any documents, outside of the basic business model, he did no due

25   diligence regarding Direct Air, and he was unsure whether a necessary investment in Swift

26   would come in as equity or a loan around the Transaction Date. (*See id.* at 542–45, 549–

27   50). Thus, the record does not support a finding that Burdette did adequate due diligence

28   before the Transaction, and the Court overrules this objection.

### 16.   Desire to See Swift Survive

Defendants assert that the Bankruptcy Court should have made a finding that Burdette and Moyes had a desire for Swift to survive beyond the Transaction. (Doc. 1 at 37). It is not clear how a finding of this subjective desire would be relevant to the analysis of the instant issues which concern Moyes's and Burdette's objective actions. Thus, the Court overrules this objection.

### 17.   Burdette's Belief Regarding Buyers' Ability to Perform

Defendants assert that the Bankruptcy Court should have made a finding that Burdette believed that the Buyers had the ability to perform their promises heading into the Transaction. (Doc. 1 at 37). Burdette, however, did not take steps to learn about the Buyers' ability to perform like reviewing documents, researching Direct Air, or knowing the particulars of how New Swift would obtain a promised $5 million investment. *See supra* Section III.B.15. Because the record shows that Burdette conducted little due diligence, the belief Burdette formed based on that minimal due diligence is not relevant to the analysis of the instant issues, and the Court overrules this objection.

### 18.   Buyers Only Wanted the 121 Business

Defendants assert that the Bankruptcy Court should have made a finding that the Buyers only wanted to purchase Swift's Part 121 Business. (Doc. 1 at 37). The Bankruptcy Court made such a finding in its discussion of the lead up to the Transaction. (*See* Doc. 19-2 at 88–89). Thus, Defendants' objection is without merit and is overruled.

### 19.   Buyers' Representations

Defendants assert that the Bankruptcy Court should have made a finding that the Buyers represented that they had adequate capital to implement their post-Transaction plan for New Swift. (Doc. 1 at 38). The Bankruptcy Court made such a finding when discussing the letter of intent that Buyers sent to Burdette regarding the Transaction. (*See* Doc. 19-2 at 90). Thus, this objection is without merit and the Court overrules it.

### 20.   Information About/Role of Spiral

Defendants assert that the Bankruptcy Court should have made a finding that Spiral

was "supposed to be an entity that was going to invest capital into the Transaction," and that Fowler represented that he had $5 million to invest into Swift. (Doc. 1 at 38). The Bankruptcy Court made a finding that Spiral was a planned investor of $5 million for Swift and that Burdette felt Fowler could make such an investment after meeting with him. (*See* Doc. 19-2 at 90). Thus, this objection is without merit and the Court overrules it.

### 21. Spiral Unknown Legal Difficulties

Defendants assert that the Bankruptcy Court should have made a finding that Spiral was placed into receivership around the time of the Transaction. (Doc. 1 at 38). The Bankruptcy Court found that, just prior to the Transaction, Spiral was "in no position to invest or loan $5 million to New Swift" because of Spiral's legal troubles. (Doc. 19-2 at 105). The Bankruptcy Court also included the "Spiral Receivership" in its list of defined terms, noting that Spiral entered receivership around the time of the Transaction. (*See id.* at 248). Thus, this objection is without merit and the Court overrules it.

### 22. Lack of Knowledge by Burdette

Defendants assert that the Bankruptcy Court should have made a finding that Burdette had no knowledge about the Spiral receivership. (Doc. 1 at 38). The Bankruptcy Court never made a finding that Burdette knew about Spiral's receivership, and it is unclear how such a finding would be relevant to the analysis of the instant issues because Burdette's lack of knowledge could have been due to a number of factors, including performing inadequate due diligence. Thus, this objection is without merit and the Court overrules it.

### 23. Causes of Swift Chapter 11 Filing

Defendants assert that the Bankruptcy Court should have made a finding that New Swift's Chapter 11 filing was caused by the failure of Spiral to invest $5 million in New Swift and the "Direct Air shutdown," arguing that both events were out of Moyes's and Burdette's control. (Doc. 1 at 38). Yet, Moyes and Burdette could have required that the $5 million investment and the merger with Direct Air be guaranteed as conditions of the Transaction but did not. *See supra* Section III.A.10, III.A.20. Additionally, the record

supports a finding that Swift was insolvent at the Transaction Date, so a finding that the cause of New Swift's Chapter 11 filing was simply the lack of investment or merger with Direct Air is not supported. *See Redeye II, LLC v. MorrisAnderson & Associates Limited*, Case No. CV-20-00855-PHX-JAT, Part III.D.1 (D. Ariz. Dec. 1, 2020). Thus, the Court overrules this objection.

### 24. Burdette's Motivations to Have Swift Survive

Defendants assert that the Bankruptcy Court should have made a finding that Burdette had a personal interest in Swift's survival because of the Swift employees whom he cared for, and that "[Burdette] considered his biggest priority and responsibility in life to be the human capital that he had the honor of bringing in to run Swift." (Doc. 1 at 38 (citing Doc. 19-3 at 662)). Yet, in the passage cited by Defendants, Burdette seems to state that Mr. Moyes's wellbeing was also a major priority. (*See* Doc. 19-3 at 662 ("And my biggest priority and responsibility to life [sic] is besides Mr. Moyes, is the human capital that I get to -- I get the honor of bringing in to run these companies.")). Thus, regardless of any stated desire to see Swift survive, the record supports the Bankruptcy Court's finding that Burdette had a strong motivation to help Moyes, and this objection is overruled.

### 25. Moyes Continued Financial Support of Swift Post-Transaction

Defendants assert that the Bankruptcy Court should have made a finding that Moyes assisted Transjet with payments on planes leased to New Swift so those planes would not be repossessed. (Doc. 1 at 38). While Moyes helped New Swift make payments on the Transjet planes, (*See* Doc. 19-3 at 408–10), Moyes had guaranteed payments on Transjet planes that leases with New Swift were helping to pay, (*See* Doc. 19-2 at 103). Because the reasoning for Moyes making the Transjet payments is unknown, and because the payments at issue were made after the Transaction when Moyes no longer had a fiduciary duty, a factual finding as to the mere existence of the payments is not relevant to the analysis of the instant issues. Thus, the Court overrules this objection.

### 26. Legacy Partners

Defendants assert that the Bankruptcy Court should have made a finding that

Burdette had no position or authority within Legacy. (Doc. 1 at 38). When discussing Legacy, the Bankruptcy Court made no findings linking Burdette to Legacy, other than the fact that Swift built up a large receivable with Legacy. (*See* Doc. 19-2 at 84, 105, 118, 123–25, 158, 219, 232). Making an additional finding that Burdette had no position within Legacy would not assist in the analysis of the instant issues. Thus, because the Bankruptcy Court made no finding linking Burdette to Legacy, the Court overrules this objection.

### 27. Advice of Counsel

Defendants assert that the Bankruptcy Court should have made a finding that Burdette got advice from counsel while negotiating with the Buyers regarding the Transaction, and that Burdette kept this advice "in mind" while negotiating the Transaction. (Doc. 1 at 39). The Bankruptcy Court found that Ehrlich advised Burdette in connection with the Transaction. (*See* Doc. 19-2 at 90). The record also shows, and the Bankruptcy Court found, that Burdette disregarded many points of advice from Ehrlich because "[i]n [Ehrlich's] world, right, A, the sky would always falling [sic] every day . . . ." (Doc. 19-3 at 444). Thus, this objection is without merit and the Court overrules it.

### 28. Buyers' Control of Payments

Defendants assert that the Bankruptcy Court should have made a finding that it was the Buyer's decision to pay Swift's pre-Transaction liabilities "in due course and not to pay them off at close." (Doc. 1 at 39). The Bankruptcy Court found that "[r]ather than insist that Buyers fully pay all Swift's outstanding 121 Payables, Moyes and Burdette agreed to let Buyers try to seek discounted payments from these Swift creditors." (Doc. 19-2 at 223). The Bankruptcy Court did not find that Moyes and Burdette required or even suggested this payment plan but merely agreed to it. Thus, this objection is without merit and the Court overrules it.

### 29. Customary Cash Management

Defendants assert that the Bankruptcy Court should have made a finding that "[i]t would be fairly customary for buyers to retain capital instead of expending all of their cash to pay the unsecured debt of an acquisition target." (Doc. 1 at 39). The only evidence

Defendants cite to support this argument is Ehrlich's testimony to this point based on his "experience in other transactional deals." (*See* Doc. 19-3 at 841–42). In making this statement, Ehrlich does not discuss exactly what other deals informed his opinion, how this deal was similar to those other deals, the nature of the Transaction itself, the industry standard for deals the size of the Transaction, or the capital that the Buyers entered the Transaction with. (*See id.*). Thus, the record does not support that Defendants' suggested finding be made, and the Court overrules this objection.

### 30.  Survival of New Swift

Defendants assert that the Bankruptcy Court should have made a finding that it was beneficial for all parties to have New Swift succeed because it would become a tenant of Services and a lessee of the Transjet planes. (Doc. 1 at 39). Yet, the Bankruptcy Court notes throughout its findings the benefits that the parties would receive for New Swift to continue operating. *See, e.g.*, *supra* Sections III.A.2, III.A.6, III.A.27. Thus, this objection is without merit and the Court overrules it.

### 31.  Absence of Claims of Lack of Information by Buyers

Defendants assert that the Bankruptcy Court should have made a finding that the Buyers never expressed concerns that they were not receiving enough financial information and that they agreed to all of Swift's pre-Transaction liabilities. (Doc. 1 at 40). In the Report and Recommendation, the Bankruptcy Court noted that the Buyers were aware of Swift's pre-Transaction liabilities. *See supra* Section III.B.28. There is also nothing in the Report and Recommendation that suggests the Buyers had concerns that they were not receiving enough financial information. If anything, the report suggests that Burdette and Moyes did not perform their own due diligence to receive adequate information from the Buyers. *See supra* Sections III.A.10, III.B.15. Thus, this objection is without merit and the Court overrules it.

### 32.  New Swift Interests Protected

Defendants assert that the Bankruptcy Court should have made a finding that both Swift and the counterparties to the Transaction were represented by counsel who were

"looking out for the interests, and advocating, on behalf of" the involved parties. (Doc. 1 at 40). Yet, the Bankruptcy Court clearly found that all parties were represented by counsel who looked after the interests of the parties. (*See* Doc. 19-2 90–92). Thus, this objection is without merit and the Court overrules it.

### 32.    Buyers Requested Transjet Leases

Defendants assert that the Bankruptcy Court should have made a finding that the Buyers asked to become lessees of the Transjet Subsidiaries and that Buyers negotiated the obligations assumed in the Transaction. (Doc. 1 at 40). When discussing the leases between New Swift and the Transjet Subsidiaries, the Bankruptcy Court made no findings that the leases were forced upon the Buyers, and the Bankruptcy Court clearly found that these leases were a part of the Transaction. (*See* Doc. 19-2 at 103). Thus, this objection is without merit and the Court overrules it.

### 34.    Ordinary Course Re: Transjet Receivables/Payables

Defendants assert that the Bankruptcy Court should have made a finding that the payables and receivables between Transjet and Swift were normally setoff against each other at the end of every month. (Doc. 1 at 40). The Bankruptcy Court, however, correctly found that this factual finding was not relevant to the issues before it because the agreements between Swift and Transjet expressly disallowed such setoff, and there was no modification of said agreements. (*See* Doc. 19-2 at 185–86); *see also supra* Section III.A.21. Thus, this objection is without merit and the Court overrules it.

### 35.    Collection of Related Party Payables

Defendants assert that the Bankruptcy Court should have made a finding that the Moyes affiliated entities were "not aggressive in trying to collect monies owed from Swift," and that "Swift had no other third party service providers on its books at the time of the Transaction or prior thereto that was ever owed more than $5 million." (Doc. 1 at 40). It is not clear how such a finding would be relevant to the analysis of the instant issues, and such a finding would most likely show that Moyes affiliated entities treated each other differently than third parties because of their loyalty to Moyes. Thus, the Court overrules

1    this objection.

2    ### 36.    Moyes's Roles in Transaction

3    Defendants assert that the Bankruptcy Court should have made a finding that Moyes

4    did not negotiate directly with the Buyers or set any of the terms in the Transaction. (Doc.

5    1 at 40). The Bankruptcy Court made such a finding throughout its Report and

6    Recommendation when describing the Transaction and noted that Moyes "knew little about

7    Swift's financial affairs and almost nothing involving the Transaction." (Doc. 19-2 at 126;

8    *see, e.g.*, Doc. 19-2 at 87–92 (noting that Burdette primarily spoke with the Buyers and that

9    Ehrlich's primary points of contact were Burdette and other Swift employees rather than

10   Moyes)). Thus, this objection is without merit and the Court overrules it.

11   ### 37.    No Hurry to Sell

12   Defendants assert that the Bankruptcy Court should have made a finding that Moyes

13   was in no hurry to sell Swift and that he was financially prepared to continue the Part 121

14   Business. (Doc. 1 at 41). The record, however, does not support this finding as evidence

15   shows that Moyes and Burdette had decided to either sell Swift or cease its operations due

16   to Swift's financial situation. *See supra* Section III.A.19. Thus, this objection is without

17   merit and the Court overrules it.

18   ### 38.    Moyes's Willingness to Continue Financing of Swift Even If No
19   ### Transaction Occurred

20   Defendants assert that the Bankruptcy Court should have made a finding that Moyes

21   was able to financially support Swift through its financial challenges and was prepared to

22   do so. (Doc. 1 at 41). Such a finding, however, goes against the record evidence that shows

23   Moyes and Burdette had decided to either sell Swift or cease its operations. *See supra*

24   Section III.A.19. Thus, this objection is without merit and the Court overrules it.

25   ### 39.    Moyes's Desire for Survival of Swift

26   Defendants assert that the Bankruptcy Court should have made a finding that Moyes

27   wanted Swift to survive after the Transaction because he was "proud of the Swift name,

28   and they [sic] had a lot of key employees that were going with the sale of the Swift Part

121 Business." (Doc. 1 at 41). It is not clear how such a finding of Moyes's subjective desire to see Swift survive would be relevant to the analysis of the instant issues. Whether Moyes wanted Swift to survive the Transaction, the record shows that Moyes undertook several actions that were not in Swift's best interests. Thus, this objection is without merit and the Court overrules it.

### 40.    Moyes' Payment of Transjet Debt So Swift Could Continue Use of Transjet Aircraft Leased to Swift

Defendants assert that the Bankruptcy Court should have made a finding that Moyes made payments on Swift's leases with Transjet so that the Transjet planes would not be foreclosed on. (Doc. 1 at 41). While Moyes helped New Swift make payments on the Transjet planes, Moyes had guaranteed payments on Transjet planes that leases with New Swift were helping to pay. *See supra* Section III.B.25. With Moyes's reasoning for making the Transjet payments being unknown, and the payments being made after the Transaction when Moyes no longer had a fiduciary duty, a factual finding as to the mere existence of the payments is not relevant to the analysis of the instant issues. Thus, the Court overrules this objection.

### 41.    Expert Testimony of Fiduciary Duties

Defendants assert the Bankruptcy Court should have made a finding that Defendants' trial expert Lyon gave an opinion that Moyes and Burdette did not violate any fiduciary duty, acted in good faith, and reasonably did not "interject [themselves] into the financing discussions with the Buyer's financing source." (Doc. 1 at 41–42). The Bankruptcy Court's findings include a discussion of Lyon's report in which the Bankruptcy Court acknowledges that "[t]he Lyon Report opines on all the Trustee's causes of action and concludes the Complaint must fail on . . . the Plaintiff's breach of fiduciary [sic] claims." (Doc. 19-2 at 163). The Report and Recommendation goes on to discuss Lyon's conclusions regarding the fiduciary duty claims in more detail, (*See id.* at 165), and Lyon's testimony regarding the fiduciary duty claims, (*See id.* at 168–69). Thus, the Court overrules this objection.

C.      **Objections to Conclusions of Law**

After thoroughly reviewing the parties' submissions and the proposed conclusions of law by the Bankruptcy Court de novo, the Court finds that the Bankruptcy Court's proposed conclusions of law should be adopted in their entirety. In making this determination, the Court further overrules each of the objections made by Defendants to the Bankruptcy Court's proposed conclusions of law. The Court will address each objection in turn.

1.      **Conclusions Regarding Swift's Operating Agreement's Limiting Fiduciary Duties Owed by Moyes and Burdette**

Defendants argue that the Bankruptcy Court incorrectly concluded that the Operating Agreement did not limit fiduciary duties owed by Moyes and Burdette arguing that Moyes and Burdette were "Officers" under the Operating Agreement and that the Report and Recommendation incorrectly interprets the limitation of fiduciary duties imposed by the Operating Agreement. (Doc. 1 at 42–47). As discussed *supra*, the Bankruptcy Court erred when it found that Moyes and Burdette were not "Officers" of Swift. *See supra* Section III.A.18. However, the Bankruptcy Court correctly concluded that, even if Moyes and Burdette qualified as "Officers," the Operating agreement did not eliminate their fiduciary duties. (*See* Doc. 19-2 at 207–209).

a.      **The Operating Agreement**

Defendants' argument that the Operating Agreement eliminated their fiduciary duties centers on ¶ 7.10 of the Operating Agreement. (*See* Doc. 1 at 43–44). ¶ 7.10 reads:

> 7.10 Company Indemnity of Manager, Officers and Member. The doing of any act or the failure to do any act by the Manager, any Officer or a Member which shall not constitute fraud or intentional, wrongful misconduct in pursuance of the authority granted, the effect of which may cause or result in loss or damage to the Company, if done in good faith, shall not subject the Manager, any officer or any Member to any liability; and in such event, the Company will indemnify and hold harmless the Manager, any Officer or any Member from any claim, loss, expense, liability, action or damage resulting from or relating to any such act or omission, including without limitation reasonable fees and expenses of attorneys engaged by them in defense of

such act or omission and other reasonable costs and expenses of litigation and appeal.

Statement of Facts in Support of Motion for Report and Recommendation, Exhibit A, *In re Swift Air, L.L.C.*, No. 14-AP-00534, at 15 (Bankr. D. Ariz. April 10, 2018), ECF No. 271-2. Defendants assert that, under ¶ 7.10, the "Operating Agreement limits liability for officers as long as their acts were (1) not fraud, (2) not "intentional, wrongful misconduct", and (3) not done in other than "good faith," and that Defendants satisfied these requirements. (Doc. 1 at 44). The Bankruptcy Court agreed with Defendants that "neither Moyes nor Burdette perpetrated actual fraud against Swift or engaged in intentional, willful misconduct while acting as officers of Swift." (Doc. 19-2 at 208–09). However, the Bankruptcy Court concluded that Defendants had not "sustain[ed] their burden of demonstrating they acted in good faith in discharging their duties as Swift's President and Vice-President." (*Id.* at 209).

Nowhere in the Operating Agreement is the term "good faith" defined. Defendants argue that the good faith requirement in the Operating Agreement is simply a requirement that the actions of an officer "not constitute a bad faith violation of the implied contractual covenant of good faith and fair dealing." (Doc. 1 at 45–46 (internal quotations omitted)). Under such a reading, Defendants argue, to expose Defendants to liability despite ¶ 7.10, "the Trustee must prove that the Defendants acted in 'bad faith.'" (*Id.* at 46). The Bankruptcy Court found that the good faith requirement in ¶ 7.10 was not "simply a recitation of the requirement that the Operating Agreement implicitly contain a covenant of good faith and fair dealing. Rather, if a Member, Manager or Officer of Swift is to be afforded the protection of ¶ 7.10, the actions or inactions of that Member, Manager or Officer must both be 'done in good faith' and 'not constitute fraud or intentional, willful misconduct.'" (Doc. 19-2 at 208). Under such a reading, the Bankruptcy Court found, Defendants have the burden of demonstrating that they acted in good faith to receive the protection of ¶ 7.10. (*Id.* at 209).

The Operating Agreement, by its terms, is governed by Arizona Law; and the parties

do not dispute that Arizona law controls. *See supra* Section III.A.18. Under Arizona law, "[w]hether a contract is ambiguous is a question of law." *Hartford*, 870 P.2d at 1207. "Language is ambiguous when it can reasonably be construed in more than one sense and such construction cannot be determined within the four corners of the instrument." *Univ. Realty*, 508 P.2d at 750. "Any ambiguity is subject to a factual determination concerning the intent of the parties and is to be resolved conclusively by the trier of fact." *Hartford*, 870 P.2d at 1207. The Court acts as the trier of fact in this de novo review of the Bankruptcy Court's proposed findings of fact and conclusions of law. *See, e.g., Cleary v. Knapp Shoes, Inc.*, 924 F. Supp. 309, 318 (D. Mass. 1996) (noting that a district court acts as the trier of fact in a de novo review of proposed findings of fact); *see also In re U.S. Currency in Amount of $26,980.00*, 18 P.3d 85, 89 (Ariz. Ct. App. 2000) (noting that a court acts as the trier of fact in a non-jury trial). The language of the Operating Agreement is ambiguous as a matter of law because the "good faith" requirement is not defined and can be construed in more than one sense when looking within the four corners of the Operating Agreement. Thus, the meaning of the good faith requirement is a question of fact for the Court to decide.

### b.    The Meaning of the Good Faith Requirement

Defendants quote the Delaware Limited Liability Act to note that operating agreements "may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing." (Doc. 1 at 45 (quote DEL. CODE ANN. § 18-1101 (e))). Defendants then use this statutory language to argue that a common shorthand has developed for operating agreements and the "if done in good faith" portion of the Operating Agreement is simply shorthand "intended to capture the statutory requirement that the limitation <u>not constitute bad faith</u>." (*Id.* at 46 (emphasis in original)). However, Defendants cite no case directly making this "shorthand" argument, and nowhere in the Delaware Limited Liability Act does it suggest that such a shorthand exists.

Defendants cite *Banas v. Volcano Corp.*, 47 F. Supp. 3d 941 (N.D. Cal. 2014), to support their "shorthand" argument. *Banas* dealt with a claim that a defendant had violated

a contractual provision that required the defendant to "act in good faith and [] use commercially reasonable efforts." *Banas*, 47 F. Supp. 3d at 946. The *Banas* court found that to make a claim that the contractual provision had been violated, the plaintiffs would need to prove that the defendant failed to act in good faith. *Id.* at 948. The *Banas* court's holding, however, is not determinative in the instant case where the good faith term in question is not required under the Operating Agreement but is connected to a limitation/waiver of fiduciary duties within the Operating Agreement.

"Arizona law implies a covenant of good faith and fair dealing in every contract." *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 38 P.3d 12, 28 (Ariz. 2002), *as corrected* (Apr. 9, 2002). This includes operating agreements for limited liability companies, and no operating agreement can eliminate the covenant of good faith and fair dealing. *See In re Sky Harbor*, 443 P.3d at 24. Thus, if the good faith requirement in ¶ 7.10 of the Operating Agreement merely required that the covenant of good faith and fair dealing be upheld, the words of the good faith requirement would be rendered surplusage as the covenant of good faith and fair dealing would necessarily run through every provision of the Operating Agreement. Yet, under Arizona law, when interpreting a contract, a court "must give meaning to all the words and clauses used by the parties . . ." *Equitable Life & Cas. Ins. Co. v. Rutledge*, 454 P.2d 869, 871 (Ariz. Ct. App. 1969); *see Weatherguard Roofing Co. v. D.R. Ward Const. Co.*, 152 P.3d 1227, 1233 (Ariz. Ct. App. 2007) (holding that  courts must attempt to reconcile and give meaning to all terms in a contract); *see also Scholten v. Blackhawk Partners*, P.2d 393, 396 (Ariz. Ct. App. 1995) ("[a] contract should be construed to give effect to all its provisions and to prevent any of the provisions from being rendered meaningless."). Thus, the Court will not interpret the good faith requirement of ¶ 7.10 of the Operating Agreement to simply echo the covenant of good faith and fair dealing contained in all contracts.[5]

Because the good faith requirement is laid out in explicit terms in ¶ 7.10 of the

---

[5] The Court is not suggesting that an agreement cannot contain surplus terms or a reference to the covenant of good faith and fair dealing. Where a contract term is ambiguous, however, the Court will attempt to construe it in a way that gives it meaning. Because the good faith term here is ambiguous, the Court declines to construe it as mere surplus.

Operating Agreement, the Court agrees with the Bankruptcy Court that ¶ 7.10 of the Operating Agreement required that Defendants prove they acted in good faith to claim the protections offered by ¶ 7.10. Because Defendants did not meet this burden, *see infra* Section III.C.2., the Operating Agreement did not limit fiduciary duties owed by Defendants and this objection is overruled.

### 2.      Conclusions Regarding Analysis of Fiduciary Duty Claims

Defendants argue that the Bankruptcy Court's conclusions regarding the analysis of the Trustee's fiduciary duty claims were in error because the Bankruptcy Court failed "in each instance to identify a specific duty, articulate the applicable standard of compliance and identify an act breaching that standard . . ." (Doc. 1 at 48). The Court, however, finds that each of the Bankruptcy Court's conclusions is well reasoned and supported by the record evidence.

The parties do not dispute that Arizona law controls the fiduciary duty claims. (*See, e.g.*, Doc. 1 at 49). Under Arizona law, a party asserting a claim for breach of fiduciary duty must prove, "the existence of a duty owed, a breach of that duty, and damages causally related to such breach." *Surowiec v. Capital Title Agency, Inc.*, 790 F. Supp. 2d 997, 1004 (D. Ariz. 2011) (citing *Smethers v. Campion*, 108 P.3d 946, 949 (Ariz. Ct. App. 2005)). As discussed *supra*, Moyes and Burdette owed common law fiduciary duties to Swift. *See supra* Section III.A.17.

A fiduciary owes "a duty of loyalty, a duty of good faith, and a duty of care." *In re Sky Harbor*, 443 P.3d at 23; *see also Gemstar Ltd. v. Ernst & Young*, 917 P.2d 222, 233 (Ariz. 1996) (a fiduciary owes a duty of "utmost loyalty, good faith and disclosure"); *DeSantis v. Dixon*, 236 P.2d 38, 41 (Ariz. 1951) (fiduciary duty imposes "the obligation of the utmost good faith"). "The duty of care refers to the responsibility to exercise the care that a reasonably prudent person in a similar position would exercise under similar circumstances." *Shoen v. Shoen*, 804 P.2d 787, 794 (Ariz. Ct. App. 1990). Further, "[t]he duty of care is evaluated according to the 'business judgment rule,' which precludes judicial inquiry into actions taken by a director in good faith and in the exercise of honest

judgment in the legitimate and lawful furtherance of a corporate purpose." *Id.* "The director's second duty, that of loyalty, springs from the prohibition against self-dealing that is inherent in a director's fiduciary relationship with the corporation and its shareholders." *Id.* "Once there is a prima facie showing that a director is personally interested in a corporate transaction . . . the burden shifts to the director to show that the decision with respect to a particular transaction is fair and serves the best interests of the corporation and the shareholders." *Id.*

The record shows that Moyes and Burdette were personally interested in the Transaction. Moyes had personal guarantees that the Transaction helped pay, *see supra* Sections III.A.4, III.A.25, Moyes used the Part 135 Business for his personal travel and had an interest in the Part 135 Business continuing, *see supra* Section III.A.1, and Moyes was able to capture the value of certain receivables through the Transaction, *see supra* Sections III.A.14, III.A.15. Similarly, Burdette had a strong personal interest in protecting and aiding Moyes which the Transaction undoubtedly promoted. *See supra* Section III.B.24. Thus, the burden of proof was on Moyes and Burdette to show that the Transaction was fair and served the best interests of Swift. *See Shoen*, 804 P.2d at 794. The Bankruptcy Court made fourteen findings upon which it concluded that Moyes and Burdette did not meet this burden and violated their fiduciary duties. The Court agrees with these findings and conclusions and will address them in turn:

### a.    Moyes and Burdette Disregarded Advice of Counsel

Ehrlich acted as Swift's counsel in the Transaction. (*See* Doc. 19-2 at 90–92). Ehrlich gave Moyes and Burdette advice on key points of the Transaction including that Swift be merged with Direct Air to bring additional equity into Swift and that Swift ensure Buyers were adequately capitalized at the Transaction Date. (*See id.* at 93–94 (citing Trial Exhibit 066, November 29, 2011, Memorandum from Ehrlich to Burdette)). Burdette himself noted the vital importance to New Swift of both the Direct Air merger and the $5 million cash infusion to ensure adequate capitalization. *See supra* Sections III.A.10, III.A.20. Yet, neither Moyes nor Burdette followed Ehrlich's advice and required that the

1   Direct Air merger be a part of the Transaction or that the $5 million come into Swift.
2   Instead, Moyes and Burdette finalized the Transaction which assisted Moyes in paying his
3   personal guarantees, *see supra* Sections III.A.4, III.A.25, allowed Moyes to continue using
4   the Part 135 Business for his personal travel, *see supra* Section III.A.1, and let Moyes
5   capture the value of certain receivables, *see supra* Sections III.A.14, III.A.15. Similarly,
6   the Transaction allowed Burdette to advance his personal interest in protecting and aiding
7   Moyes. *See supra* Section III.B.24.

8       Such actions show that Moyes and Burdette did not act in good faith or out of loyalty
9   to Swift, but instead promoted their own interests. While Defendants argue that the
10   Bankruptcy Court did not identify what specific fiduciary duties were breached by the
11   instant facts, the Bankruptcy Court found that Moyes's and Burdette's actions constituted
12   a violation of the duties of "'utmost good faith' or of 'loyalty.'" (Doc. 19-2 at 215). Thus,
13   the Bankruptcy Court's conclusions here are well supported by the record and the law.[6]

14       **b.    Moyes Captured the Value of the 135 Related Party**
15          **Receivables**

16       Through the Transaction, Moyes was able to capture the value of certain Swift
17   receivables. *See supra* Sections III.A.14, III.A.15, III.B.14. Defendants argue that this fact
18   does not show a breach of fiduciary duty because, through the Transaction, Swift was able
19   to eliminate payables owed to Moyes affiliates that were worth more than the receivables.
20   (*See* Doc. 1 at 52–53). Yet, the record shows that Moyes's capturing of the receivables was
21   for his own benefit and not Swift's.

22       Under the leadership of Moyes and Burdette, Swift allowed significant receivables
23   to build up from companies that had no way to pay these receivables on the Transaction
24   Date. *See, e.g.*, *supra* Sections III.A.21, III.A.28. Defendants argue that this was in Swift's
25   best interest because Swift's payables were also allowed to accrue without payment.
26   Defendants cite no evidence, however, showing that allowing million-dollar accounts
27   payable and receivable to build up with companies that have no way to satisfy their debts

28   _____
[6] Defendants also argued the issue of damages in this objection. The damages argument
will be addressed *infra* at Section III.C.4.

is in the best interest of a company. Such a practice was in Moyes's best interest because it allowed his companies to continue transacting business with each other regardless of ability to pay down debts.

Additionally, while the Swift payables extinguished by the Transaction were for a greater amount than the Swift receivables at issue, Swift was already insolvent by the time of the Transaction, possibly due in part to the practice of not collecting on debts owed from Moyes affiliates. *See Redeye II, LLC v. MorrisAnderson & Associates Limited*, Case No. CV-20-00855-PHX-JAT, Part III.D.1 (D. Ariz. Dec. 1, 2020). Thus, simply extinguishing accounts payable and receivable with Moyes affiliates through the Transaction was not in Swift's best interests as it did nothing to help with Swift's cash crunch, but it was in Moyes's best interests to get as much value as possible out of Swift's accounts.

Thus, the Court agrees with the Bankruptcy Court's conclusion that Moyes violated his fiduciary duty of loyalty when he captured the value of Swift's receivables.

### c.    SAM Retained the 135 Business

The Transaction called for the Part 135 Business to be retained by SAM, and for the Swift company name and domain name to revert to a Moyes owned business after SAM obtained its own Part 135 Certificate. (*See* Doc. 19-2 at 217). While the record shows that the Buyers only wanted Swift's Part 121 Business, the record also shows that the retention of the Part 135 Business was not done to promote Swift's interests, but instead to promote Moyes's. Moyes utilized the Part 135 Business to operate his own private aircraft. *See supra* Section III.A.1. Thus, the Transaction's allowance for the survival of the Part 135 Business regardless of Swift's survival was certainly in Moyes's interest.

Additionally, the fact that Swift's name and domain name would revert to Moyes was also in Moyes's interest, not Swift's. Defendants assert in the Redeye Appeal that Swift's "goodwill," which would include its company and domain name, had value. (*See* Doc. 19 at 16, 31). So, stripping Swift of these elements of goodwill and transferring them to a Moyes affiliate would strip Swift of whatever value the Swift name had and deliver it to Moyes. Thus, the fact that Swift's name and domain name would revert to Moyes

provides yet another example of Moyes being loyal to his own interests over Swift's. While Defendants may contend that Swift received other value for this loss of goodwill, Defendants present no evidence to support such a claim.

Thus, the Court agrees with the Bankruptcy Court's conclusion that Moyes violated his fiduciary duty of loyalty when he ensured that SAM would retain the Part 135 Business and that New Swift would have to surrender the Swift company name and domain name.

### d. Moyes Was Motivated to Have New Swift Pay the Debt He Guaranteed on the Transjet Planes

As discussed *supra*, Moyes was motivated to have New Swift pay the debt he guaranteed on the Transjet planes. *See supra* Section III.A.25. The lease rates on these planes for New Swift were not set at any market rate but were set at the amount of the monthly payments guaranteed by Moyes on these planes. *See supra* Section III.A.4. The record shows that these rates may have been in excess of market rates. *See supra* Sections III.A.5, III.A.7. Regardless of what the market rate for these leases at the time of the Transaction was, the fact that the payment amounts guaranteed by Moyes were used to set the lease payments, rather than the market rate, shows a loyalty to Moyes's interests over Swift's. Thus, the Court agrees with the Bankruptcy Court's conclusion that Moyes and Burdette violated their fiduciary duties of loyalty in agreeing to the lease rates for the Transjet planes.

### e. Moyes Benefitted by New Swift Assuming $1.2 Million Payable to Transjet

The Transaction involved New Swift assuming a $1.2 million payable to Transjet that was not on Swift's books before the Transaction. (*See* Docs. 19-2 at 218, 19-3 at 864–66, 963–37). Taking on such a debt was certainly not beneficial to New Swift as New Swift was already cash strapped. However, New Swift assuming this debt was beneficial to Moyes who still owned Transjet and had guaranteed some of Transjet's debts. While Defendants argue that the debt at issue was simply part of an arm's-length transaction, the Transjet payable was not included in the documents leading up to the Transaction, (*See*

Doc. 19-3 at 864–66), and the Buyers were "surprised" that they had to assume this additional liability, (*See id.* at 936–37).  Thus, the Court agrees with the Bankruptcy Court's conclusion that Moyes and Burdette violated their fiduciary duties of loyalty by saddling New Swift with this Transjet payable.

### f.      Moyes Was Motivated to Keep Business Flowing to Services and Transpay

Moyes was motivated to keep Business flowing to Services and Transpay, and the Transaction benefitted Moyes in this regard. *See supra* Sections III.A.26, III.A.27. While this is not, on its own, evidence that Moyes and Burdette violated their fiduciary duties, when combined with other record evidence it shows that Moyes and Burdette were not acting out of loyalty to Swift when engaging in the Transaction, but out of loyalty to Moyes's interests. Thus, the Court agrees with the Bankruptcy Court's determination that these findings add to the conclusion that Moyes and Burdette violated their fiduciary duties.

### g.      Moyes Benefited from the Legacy Transaction

As discussed *supra*, Moyes benefitted from the Legacy transaction. *See supra* Section III.A.28. Both the transfer of the Legacy receivable owed to Swift and Swift's allowance for the Legacy receivable to build up to nearly $4 million benefited Moyes as Swift did not require Legacy to satisfy its outstanding debts, and when the debt was satisfied it was used to reduce a debt owed by Swift to Moyes. *See id.* Thus, the Court agrees with the Bankruptcy Court's conclusion that Moyes and Burdette violated their fiduciary duties of loyalty by allowing the Legacy receivable to build up and then using it to satisfy debt owed to Moyes by Swift.

### h.      Moyes and Burdette Gained Indemnities from the Transaction

It is undisputed that Moyes and Burdette gained indemnities from the Transaction. (*See* Doc. 19-2 at 220–22). These indemnities shielded Moyes and Burdette from claims to which they may have been exposed had Swift been shut down rather than sold. (*See id.* at 222). The Bankruptcy Court acknowledged that these types of indemnification agreements

are "commonplace in business sales." (*Id.*). On their own, such indemnities do not lead to a conclusion that any fiduciary duty has been breached. However, when combined with the rest of the record in the instant case, they show yet another personal benefit received by Moyes and Burdette as a result of the Transaction. Thus, the Court agrees with the Bankruptcy Court's determination that these findings add to the conclusion that Moyes and Burdette violated their fiduciary duties.

### i.    Moyes and Burdette Sought to Reduce Their Exposure on the Transportation Taxes

In the initial discussions surrounding the Transaction, the Buyers were expected to pay off Swift's transportation taxes at closing. (*See* Doc. 19-3 at 840). Having the transportation taxes paid at closing would have been a significant help to a cash-strapped Swift. Moyes and Burdette, however, did not ultimately require the Buyers to pay off Swift's outstanding transportation taxes as a part of the Transaction because "the [Buyers] wanted to negotiate when [they] would pay the [transportation] tax liability." (*See id.*). While not requiring the transportation taxes to be paid at closing may have helped assure that the Transaction went forward which benefitted Moyes and Burdette, it left New Swift with more liabilities that it did not have the money to pay off. Moyes and Burdette's failure to require the Buyers to pay Swift's Transportation Taxes as a part of the Transaction is yet another example of how Moyes and Burdette placed their own interests ahead of Swift's. Thus, the Court agrees with the Bankruptcy Court's determination that these findings add to the conclusion that Moyes and Burdette violated their fiduciary duties.

### j.    Moyes and Burdette Cut Swift's 121 Payable Creditors Adrift

Moyes and Burdette did not require that the Buyers pay off Swift's pre-transaction payables as a part of the Transaction. *See supra* Section III.A.30. While this placed Swift's creditors in an unfortunate position, it also hampered Swift by keeping heavy demands on its already limited cash. This is yet another example of how Moyes and Burdette were not acting in Swift's best interests through the Transaction. Thus, the Court agrees with the

Bankruptcy Court's determination that these findings add to the conclusion that Moyes and Burdette violated their fiduciary duties.

### k.      Moyes Enjoyed Tax Benefits from the Transaction

As discussed *supra*, Moyes enjoyed tax benefits from the Transaction. *See supra* Section III.A.12. While these tax benefits are not, on their own, evidence that Moyes violated a fiduciary duty, when combined with other record evidence they show that Moyes was not acting out of loyalty to Swift when engaging in the Transaction, but out of loyalty to his own interests. Thus, the Court agrees with the Bankruptcy Court's determination that these findings add to the conclusion that Moyes violated his fiduciary duties.

### l.      SAVM's Cash Was Drained by Moyes

As discussed *supra*, Moyes received millions of dollars in payments from SAVM that left SAVM without cash to pay certain payables owed to Swift. *See supra* Section III.A.31. It is undisputed that Moyes and Burdette were the president and vice-president of SAVM, and thus had control over SAVM's operations. (*See* Doc. 19-2 at 78). By making these payments and favoring Moyes and other creditors over Swift, Moyes and Burdette supported Moyes's interests over Swift's. Thus, the Court agrees with the Bankruptcy Court's conclusion that Moyes and Burdette violated their fiduciary duties of loyalty by draining SAVM of cash to satisfy debts owed to and guaranteed by Moyes.

### m.      Moyes's Personal Interests Were Served by Ehrlich

It is uncontested that Ehrlich was both Swift's and Moyes's lawyer. (*See* Doc. 19-2 at 90). As president and vice-president of Swift, and as the individuals in charge of Swift's operations and decision making, Moyes and Burdette were responsible for selecting Ehrlich as Swift's counsel. Additionally, as discussed *supra*, Ehrlich knew that Swift's insolvency was a cloud hanging over the Transaction, and there is no evidence that Ehrlich obtained, or suggested Swift obtain, an expert's opinion on Swift's solvency prior to the Transaction. *See supra* Section III.A.32.

These findings show that Ehrlich knew that Swift may have been insolvent at the Transaction Date but did nothing to confirm Swift's solvency prior to approving the

Transaction. The Court agrees with the Bankruptcy Court's determination that Ehrlich allowed the Transaction to proceed with such significant questions hanging over Swift to benefit Moyes's interests rather than Swift's. Thus, the Court agrees with the Bankruptcy Court's determination that these findings add to the conclusion that Moyes and Burdette violated their fiduciary duties by allowing Swift to retain counsel that would support Moyes's interests over Swift's.

### n.    The Existence of Badges of Fraud Further Support a Finding of Breach of Fiduciary Duty

The Bankruptcy Court found, and Defendants do not dispute, that Defendants undertook actions related to the Transfer that bore certain "badges of fraud." (*See* Docs. 19-2 at 225, 1 at 62–63). Such actions that support claims of fraud similarly support claims of breach of fiduciary duty. *See Dawson v. Withycombe*, 163 P.3d 1034, 1057 (Ariz. Ct. App. 2007) (noting that constructive fraud involves a breach of a fiduciary duty coupled with detrimental reliance); *Green v. Lisa Frank, Inc.*, 211 P.3d 16, 34 (Ariz. Ct. App. 2009) (same). Thus, the Court agrees with the Bankruptcy Court's conclusion that Defendants' actions that support claims of fraud add to the conclusion that Moyes and Burdette violated their fiduciary duties.

### o.    Conclusions Regarding Fiduciary Duty Claims Analysis

The Bankruptcy Court undertook a lengthy analysis of the Trustee's claims for breach of fiduciary duty. The Bankruptcy Court correctly concluded that, under Arizona law, a party asserting a claim for breach of fiduciary duty must prove, "the existence of a duty owed, a breach of that duty, and damages causally related to such breach." *Surowiec*, 790 F. Supp. 2d at 1004. The Bankruptcy Court also correctly concluded that Moyes and Burdette owed common law fiduciary duties to Swift. *See supra* Section III.A.17. The Bankruptcy Court further correctly concluded that Moyes and Burdette breached their fiduciary duties of good faith and loyalty in various ways connected to the Transaction. These breaches caused damages for Swift. *See infra* Section III.C.4. Thus, the Court finds that the Bankruptcy Courts proposed conclusions of law regarding the analysis of the

Trustee's fiduciary duty claims are sound and overrules Defendants' objection.

### 3.    Conclusions Regarding Burden of Proof

The Bankruptcy Court concluded that "Moyes and Burdette bear the burden of proving they, as fiduciaries of Swift, discharged [their] duty exercising the utmost good faith and that at all times they acted with loyalty to Swift." (Doc. 19-2 at 210). Defendants assert that this conclusion was incorrect noting that the Bankruptcy court did "not cite any authority for the proposition that Defendants bear the burden of proving they discharged any fiduciary duties they might have owed in good faith and with loyalty." (Doc. 1 at 63). Defendants additionally argue that Arizona law supports their argument that the burden here lies with Plaintiff, not Defendants, (*id.*), and that "the common law areas of both an officer's fiduciary duty and the burden shifting pursuant to the business judgment rule has [sic] been completely replaced by statute," (*id.* at 65 (citing *Wichansky v. Zowine*, No. CV-13-01208-PHX-DGC, 2016 WL 11002479, at *2 (D. Ariz. Apr. 19, 2016))).

To begin, the Bankruptcy Court cited *Gemstar* to support its position on burden shifting. (*See* Doc. 19-2 at 209). When discussing the jury instructions given in the underlying case, the *Gemstar* court did not find any error in the jury instruction stating, "[d]efendants have the burden of proving full compliance with all of their fiduciary duties. If the defendants failed to prove this full compliance, then the fiduciary relationship has been breached." *Gemstar*, 917 P.2d at 233. Of course, the present case did not involve a jury trial, so the jury instruction for *Gemstar* is not definitive in the Court's analysis.

Arizona law, however, supports the Bankruptcy Court's conclusion. It is true that under Arizona law, a plaintiff asserting a claim for breach of fiduciary duty must prove, "the existence of a duty owed, a breach of that duty, and damages causally related to such breach." *Surowiec*, 790 F. Supp. 2d at 1004. Nevertheless, when analyzing the fiduciary duty of loyalty, "[o]nce there is a prima facie showing that a director is personally interested in a corporate transaction, the business judgment rule does not apply, and the burden shifts to the director to show that the decision with respect to a particular transaction is fair and serves the best interests of the corporation and the shareholders." *Shoen*, 804 P.2d at 794;

see also *Kadish v. Phx.-Scotts. Sports Co.*, 466 P.2d 794, 797 (Ariz. App. Ct. 1970) (". . . where the acts of an officer or director smack of self-dealing . . . the officer or director has the burden of proving the fairness of the transaction to the corporation to which they owe a fiduciary duty."). Here, Moyes and Burdette engaged in the Transaction which "smack[ed] of self-dealing" in that it promoted their own personal interest while leaving Swift in a precarious position. *See Kadish*, 466 P.2d at 797 (finding that business transactions smacked of self-dealing when the defendant corporate director caused the plaintiff corporation to engage in transactions with another corporation owned by the defendant, and these transactions promoted the defendant's personal interests). Thus, under Arizona law, the burden of proving that the Transaction was fair and served the best interests of Swift shifted to Moyes and Burdette.

Finally, Defendants argue that *Shoen's* burden shifting is no longer good law because of a recent decision in the District of Arizona, *Wichansky*. (*See* Doc. 1 at 65). In *Wichansky*, the court "concluded that the fiduciary duties of directors and officers are defined by [A.R.S. § 10-830] in Arizona," and that "[n]o Arizona case holds that the common law of director and officer duties survives these statutes, and commentators suggest it does not." *Wichansky*, 2016 WL 11002479, at *2. The Court notes first that an unpublished opinion by a court in the District of Arizona is persuasive, not binding, authority in this Court. *See Camreta v. Greene*, 563 U.S. 692, 709 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.").

The Court next notes that nothing in A.R.S. § 10-830 states an intent for the statute to act as the only source of fiduciary duties in Arizona, or an intent to limit *Shoen's* holding. *See* A.R.S. § 10-830. Further, in a nonbinding unpublished opinion, the Arizona Court of Appeals found that "[n]othing in [A.R.S. § 10-830] shows an intent to eviscerate, limit, or even address the reasoning and holding of *Shoen*. *Shoen* remains good law, and as such the trial court is presumed to know it and apply it in rendering a decision." *Singh v. Malhotra*, No. 1 CA-CV 17-0033, 2018 WL 1004282, at *8 (Ariz. Ct. App. Feb. 22, 2018). While

—

*Singh* is not binding precedent in Arizona, it provides support for the contention that *Shoen's* burden shifting is still good law and applies in the instant case.

Finally, the Court notes that *In re Sky Harbor* seems to undercut the reasoning in *Wichansky*, at least as it applies to a limited liability company, like Swift. In *In re Sky Harbor*, the Arizona Supreme Court found that "a member owes *common law* fiduciary duties to the LLC if the member acts as an agent of the LLC." *In re Sky Harbor*, 443 P.3d at 24 (emphasis added). Thus, Arizona law recognizes that agents owe common law, not simply statutory, duties to limited liability companies like Swift. Because of this, *Shoen's* holding related to the common law fiduciary duty of loyalty is still good law, and the Bankruptcy Court was correct to apply it in the instant case.

Thus, the Court agrees with the Bankruptcy Court's conclusion that the burden to prove compliance with their fiduciary duties had shifted to Moyes and Burdette, and the Court overrules this objection.

### 4.    Conclusions Regarding Damages

The Bankruptcy Court concluded that the damages associated with Moyes's and Burdette's breaches of fiduciary duties were $12,136,669, which was the amount of the Part 135 Business related party receivables transferred by Swift in the Transaction. (Doc. 19-2 at 232). To arrive at this conclusion, the Bankruptcy Court looked to sources including the Restatement (Second) of Torts which states, "[o]ne standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation." (*Id.* at 200–01 (quoting Restatement (Second) Of Torts § 874 (1979))). The Bankruptcy Court also quoted the Revised Arizona Jury Instructions (Civil) 5th ("RAJI") which say that if a defendant is found guilty of a breach of fiduciary duty, the jury must decide the amount of money that will "reasonably and fairly compensate [the plaintiff] for any of the following elements of damage proved by the evidence to have resulted from [defendant]'s breach of this duty: 1. Loss of money or other property; . . . 3. Money or property that is unjust for [defendant] to keep; . . ." (*Id.* at 202 (quoting RAJI, Commercial Torts 3 Fiduciary Duty (Measure of Damages)).

Under Arizona law, "[o]nce the right to damages is established, uncertainty as to the amount of damages does not preclude recovery." *Lewis v. N.J. Riebe Enterprises, Inc.*, 825 P.2d 5, 18 (Ariz. 1992). Nevertheless, there must still be "a reasonable basis in the evidence for the trier of fact to fix compensation when a dollar loss is claimed." *Short v. Riley*, 724 P.2d 1252, 1255 (Ariz. Ct. App. 1986). The Bankruptcy Court noted, and the Court agrees, that "no Arizona cases explain with particularity how the trier of fact is to measure damages for 'loss of . . . property' or 'property that is unjust for [the defendant] to keep.'" (Doc. 19-2 at 202 (quoting RAJI, Commercial Torts 3 Fiduciary Duty (Measure of Damages)) (alteration in original)). Because the exact amount of damages caused by Moyes's and Burdette's breaches of fiduciary duties cannot easily be measured, the Bankruptcy Court concluded that $12,136,669 was appropriate based on the record. (*See id.* at 232). This was the value of the Part 135 Business related party receivables transferred by Swift in the Transaction. (*See id.*).

Defendants argue that this damage amount was inappropriate because the Report and Recommendation did not "find that Swift suffered a loss or that the Defendants received property that was unjust to keep" because the Bankruptcy Court "already determined that Swift received 'reasonably equivalent value' in the Transaction." (Doc. 1 at 68 (quoting Doc. 19-2 at 199)). The portion of the Report and Recommendation cited by Defendants to support this claim is the portion noting that the Trustee "did not carry his burden of proving Swift received less than reasonably equivalent value in return for the transfer of the [Part] 135 Business and the 135 Related Party Receivables." (Doc. 19-2 at 199). It is worth noting that the Trustee not carrying his burden of proving Swift received less than reasonably equivalent value is not the same as finding that Swift received reasonably equivalent value. Additionally, this portion of the Report and Recommendation notes that "Swift transferred receivables totaling $12,136,669 but received from the transferees debt relief in the aggregate of $12,997,903. In other words, Swift received more value than it transferred away." (*Id.*).

Notably, the Bankruptcy Court explicitly found that Swift suffered a loss in the form

of damages due to the Transaction. When noting that the damages owed by Moyes's were the value of the Part 135 Business related party receivables, the Report and Recommendation stated that "New Swift and Debtor sustained damages in a like amount." (*Id.* at 232). The damages suffered by New Swift were the loss of the right to payment on the transferred receivables. While the transferred receivables were setoff against certain of Swift's payables, extinguishing debts through setoff is not the same as a cash payment on that debt. *See Blount v. Windley*, 95 U.S. 173, 179 (1877) ("The idea of set-off is not the same as payment."); *see also United States v. Horschel*, 205 F.2d 646, 648 (9th Cir. 1953) (noting that paying with a promissory note and warehouse credit is not the same as paying in cash). Swift was cash strapped and needed money to operate. Rather than collect on the outstanding related party receivables—which had inappropriately built up over time—so this necessary cash could be obtained, Moyes and Burdette caused the receivables to be inappropriately setoff against certain payables. This damaged Swift while ensuring Moyes received as much value from the Transaction as possible.

The Bankruptcy Court also found that Moyes was enriched by the Transaction in the amount of the receivables transferred by Swift, $12,136,669. (Doc. 19-2 at 232). Defendants argue that, even if Moyes was unfairly enriched by the Transaction, there is no evidence that Burdette received any money from the Transaction, so there are no damages that can be attributed to Burdette. (Doc. 1 at 68–69). As stated above, however, the damage award against Moyes and Burdette on the breach of fiduciary duty claims does not lie solely in unjust enrichment, but also stems from the direct damage done to Swift. Thus, Burdette is also liable to Swift for the damages directly caused by his breaches of fiduciary duty.

Thus, the Bankruptcy Court was correct to conclude that Moyes's and Burdette's breaches of fiduciary duties damaged Swift and that Swift was owed $12,136,669 in compensatory damages from Moyes and Burdette due to these breaches, and the Court overrules this objection.

### 5.    Conclusions Regarding Transjet Setoff

Defendants argue that the inclusion of the $1,802,669 receivable owed to Swift by

Transjet (the "Transjet Receivable") in the damages for breach of fiduciary duty is improper because the Report and Recommendation "provides no justification for why the Transjet setoff now constitutes a breach of fiduciary duty (or at least provides a measure of damages thereunder)." (*See* Doc. 1 at 69–70). Yet, the Bankruptcy Court analyzed the Transaction in detail and found that Moyes and Burdette violated their fiduciary duties by agreeing to it on Swift's behalf, and the Court agrees with this analysis. *See supra* Section III.C.2.

Additionally, the Court finds that the setoff effectuated by Defendants of the Transjet Receivable was inappropriate under Swift's agreements with the Transjet Subsidiaries. *See Transjet Incorporated v. MorrisAnderson & Associates Limited*, Case No. CV-20-00849-PHX-JAT, Section III.B (D. Ariz. Dec. 1, 2020). Thus, the Court agrees with the Bankruptcy Court's conclusion that, like the other related party receivables transferred or setoff by Swift in the Transaction, allowing for the setoff of the Transjet Receivable was a breach of Moyes's and Burdette's fiduciary duties and damaged Swift. *See supra* Sections III.C.2–4. Accordingly, the Court overrules this objection.

### 6.    Conclusions Regarding Creditor Claims

Defendants assert that the Bankruptcy Court improperly considered creditor claims in determining the damages owed by Moyes and Burdette to Swift. (Doc. 1 at 70–71). In making this argument, Defendants quote the portion of the Report and Recommendation's breach of fiduciary duty claim analysis which notes:

> Swift was relieved of millions of dollars of debt owed to Moyes and his entities, but in doing so Moyes and his entities captured millions of dollars in value that would have either been lost had Swift shut down or value which rightly should have been shared with other Swift creditors who were not in a position to make sure they were satisfied ahead of or on par with Moyes and Swift's Affiliates.

(*Id.* (quoting Doc. 19-2 at 217)). This quote, however, is simply a statement included in one of fourteen different findings made by the Bankruptcy Court when analyzing the fiduciary duty claims. It does not define, or even authoritatively speak to, damage

calculation. It simply reinforces a fact that runs throughout the entirety of the fiduciary duty analysis: Moyes used the Transaction to advance his own interests over anyone else's.

Additionally, as discussed *supra*, the creditor claims are not the source of the damage calculation made by the Bankruptcy Court, but the actual injuries suffered by Swift as a result of the Transaction are. *See supra* Section III.C.4. Thus, the Court agrees with the Bankruptcy Court's conclusions regarding damages and overrules this objection.

### 7.    Conclusions Regarding the Settlement Agreement

Defendants object to the Bankruptcy Court's conclusion that the Settlement Agreement did not release Moyes and Burdette from any breach of fiduciary duty claims asserting that the language of the Settlement Agreement clearly releases all Defendants from such claims. (Doc. 1 at 71–74). The pertinent sections of the Settlement Agreement are Sections 2 and 4 which read:

> Section 2. <u>Settlement Terms</u>. The Parties hereby agree that any and all amounts, accounts receivables, debts and obligations, whatsoever, owed and unpaid by Swift to any Seller Party and any and all amounts, accounts receivables, debts and obligations, whatsoever, owed and unpaid by any Seller Party to Swift, in both cases prior to and until, but not after, the Closing, be and they hereby are fully settled and released, provided, however, that Seller may request that Swift, in lieu of releasing amounts due by a Seller Party to Swift, assign such amount to Seller or Management. Notwithstanding the foregoing, nothing contained herein shall serve to discharge any amounts owed by Swift to (a) Transport Risk for insurance premiums pertaining to the Part 121 Business, (b) Transpay, Inc. in connection with its existing oral employee leasing agreement with Swift with respect to employees working in the Part 121 Business, or (c) any Transjet Account Payable being assumed by Swift pursuant to the terms of the Purchase Agreement. Also notwithstanding the foregoing, nothing contained herein shall release any Seller Party that is party to the Purchase Agreement or any other agreement entered into pursuant to the Purchase Agreement including, but not limited to the Part 135 Business Transition Services Agreement, the Transpay Employee Leasing Agreement, and the Part 135 Assignment and Assumption Agreement and Guarantee (collectively, the "**Other Agreements**") from any indemnity or other obligation of such party pursuant to the Purchase Agreement or any such Other Agreement. The Seller Parties represent, warrant and covenant that there are no other

Affiliates of the Seller Parties to whom any amount, account receivable, debt or other obligation is owed by Swift at the time of the Closing, and the Seller, SAS, Sales and Management, jointly and severally, will indemnify Swift against any Losses for any such claim from an Affiliate of the Seller Parties who is not a Party to this Agreement. Notwithstanding the foregoing, Seller may request that Swift, in lieu of releasing any amount due by a Seller Party to Swift with respect to the Part 135 Business, assign such amount to Seller or to Swift Aircraft Management, L.L.C. . . .

Section 4. <u>Mutual Release</u>. Subject to terms set forth in Section 2, the Swift on the one side and Seller Parties on the other side, and their respective members, managers, stockholders, directors, officers, partners, employees and agents, hereby mutually release one another from any and all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions, duties, obligations, indemnities, claims and demands whatsoever, in law or equity which the Parties and their respective directors, officers, partners, employees and agents shall or may have, for, upon or by reason of the amounts, accounts receivables, debts and obligations described in Section 2, from the beginning of the world to the Closing.

(Doc. 19-5 at 19, 20). The Bankruptcy Court found that the release language of Section 4 was subject to Section 2 and applicable only to the "amounts, accounts receivables, debts and obligations" detailed in Section 2. (*See* Doc. 19-2 at 205). The Court agrees with the Bankruptcy Court's reading of the Settlement Agreement.

By its terms, the Settlement Agreement is governed by New York law and the parties do not dispute this. (*See* Doc. 19-5 at 21). Under New York law, "[c]onstruction of an unambiguous contract is a matter of law, and the intention of the parties may be gathered from the four corners of the instrument and should be enforced according to its terms." *Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. Ct. App. 2007). "A contract is ambiguous if the language used lacks a definite and precise meaning, and there is a reasonable basis for a difference of opinion." *Williams v. Vill. of Endicott*, 936 N.Y.S.2d 759, 761 (N.Y. App. Div. 2012) "Further, a contract should be 'read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose.'" *Beal Sav. Bank*, 865 N.E.2d at 1213–14 (quoting

*Westmoreland Coal Co. v. Entech, Inc.*, 794 N.E.2d 667, 670 (N.Y. Ct. App. 2003)).

The Settlement Agreement is not ambiguous. The language of Section 4 clearly limits its terms to causes arising "for, upon or by reason of the amounts, accounts receivables, debts and obligations described in Section 2." (Doc. 19-5 at 20). Section 2 describes the amounts, accounts receivables, debts and obligations as "any and all amounts, accounts receivables, debts and obligations, whatsoever, owed and unpaid . . . prior to and until, but not after, the [Transaction Date]." (*Id.* at 19). Moyes's and Burdette's fiduciary duties were owed to Swift by virtue of their positions at Swift, *see supra* Section III.A.17, not because of any amounts, accounts receivables, debts and obligations owed and unpaid by Swift. It is clear from the four corners of the Settlement Agreement that Section 2 unambiguously fails to include fiduciary duties in the settlement terms, so Section 4 cannot release Moyes and Burdette of their fiduciary duties because it is explicitly limited to the claims arising from Section 2.

When reading the Settlement Agreement as a whole, it did not release Moyes and Burdette from breach of fiduciary duty claims related to the Transaction. Thus, the Court agrees with the conclusions reached by the Bankruptcy Court regarding the Settlement Agreement and overrules this objection.[7]

### 8.    Conclusions Regarding *In Pari Delicto* Defense

Defendants object to the Bankruptcy Court's rejection of Defendants' *in pari delicto* defense arguing that "the Transaction was the result of good-faith arm's length negotiations" between the Buyers and the sellers of Swift, so if the Transaction was inequitable then both parties were at equal fault. (Doc. 1 at 74–75). While the Court does not contest Defendants' assertion that the Buyers and the sellers of Swift were at arm's length, such a finding does not render the Bankruptcy Court's conclusion faulty.

"'The doctrine of *in pari delicto* dictates that when a participant in illegal, fraudulent, or inequitable conduct seeks to recover from another participant in that conduct,

---

[7] Because the language of the Settlement Agreement unambiguously fails to release Moyes and Burdette from any breach of fiduciary duty claims, the Court need not address the Bankruptcy Court's conclusions made in the alternative on this issue and the Defendants' arguments regarding those conclusions.

the parties are deemed *in pari delicto*, and the law will aid neither, but rather, will leave them where it finds them.'" *In re Bill Johnson's Restaurants, Inc.*, 255 F. Supp. 3d 927, 934 (D. Ariz. 2017) (quoting *Smith ex rel. Estates of Bos. Chicken, Inc. v. Arthur Andersen L.L.P.*, 175 F. Supp. 2d 1180, 1198 (D. Ariz. 2001)). The Ninth Circuit has endorsed the use of *in pari delicto* to defend against civil claims. *See Kardoh v. United States*, 572 F.3d 697, 700 (9th Cir. 2009) (applying defense of *in pari delicto* to resolve a civil issue). "Application of *in pari delicto* is governed by state law." *In re Tarczynski*, No. ADV 14-01149-BB, 2015 WL 728410, at *11 (B.A.P. 9th Cir. Feb. 19, 2015). Under Arizona law, the defense of *in pari delicto* applies only "when the parties to the wrongful act are equally at fault. It need not apply when one party's wrong is slight compared to the other." *Brand v. Elledge*, 360 P.2d 213, 216 (Ariz. 1961). This means that "where the parties are not equal in guilt (*in pari delicto*) but where one of them, although participating in the wrong, is less guilty than the other, the party more at fault cannot employ the doctrine of *pari delicto* to shield his deliberate invasion of the rights of the former." *Id.* at 217.

Here, the Bankruptcy Court correctly rejected Defendants' *in pari delicto* defense because Defendants and Swift were not equal in guilt. Moyes and Burdette used their power as officers of Swift to enter into the Transaction for their own benefit. *See supra* Section III.C.2. Swift was merely a vehicle used by Moyes and Burdette to effectuate the Transaction and bears no responsibility for entering into the Transaction against its own interest. *See In re Bill Johnson's Restaurants*, 255 F. Supp. 3d at 934 (holding that, where agents of a corporation are acting in a manner adverse to the interests of the corporation, the "adverse interest exception" applies, with the result that the actions of the agents are not imputed to the corporation); *see also In re Mortg. Fund '08 LLC*, 527 B.R. 351, 368 (N.D. Cal. 2015) (applying adverse interest exception to a limited liability company); *In re 1031 Tax Grp., LLC*, 420 B.R. 178, 207 (Bankr. S.D.N.Y. 2009) (same).

Further, Defendants' argument that the Transaction was the result of arm's length negotiations so both the Buyers and the sellers of Swift bear the same responsibility is inapplicable to this *in pari delicto* analysis. The breach of fiduciary duty claims are claims

by the Trustee, acting for Swift, against Moyes and Burdette. The Buyer's actions leading up to the sale are not at issue. To be sure, the Buyers ultimately gained control of Swift via the Transaction, but the Buyers and Swift were wholly separate actors while Moyes and Burdette were breaching their fiduciary duties owed to Swift.

Finally, Defendants' assert that the *in pari delicto* defense should apply because "Swift received a net benefit from the Transaction." (Doc. 1 at 75 (citing Doc. 19-2 at 199)). As discussed *supra*, while the amount of Swift's debt relieved by the Transaction was greater than the amount in accounts receivable transferred by Swift in the Transaction, Swift still suffered damages while Moyes and Burdette received only benefit. *See supra* Sections III.C.2, III.C.4. Thus, compared to Moyes and Burdette, Swift did not receive a net benefit such that the *in pari delicto* defense should apply.

Accordingly, the Court agrees with the Bankruptcy Court's proposed conclusions of law on this point, and this objection is overruled.

### D.    Objections to the Bankruptcy Court's Use of Judicial Notice

Defendants' final objections assert that the Bankruptcy Court erred in taking judicial notice of certain facts. (Doc. 1 at 76–82). Defendants contend the improperly noticed facts include facts related to Saipan Air Inc. ("Saipan Air") and "common practice" in transactions like the one at issue. (*Id.*). The Court will address the legal standard for its review and each objection in turn.

#### 1.    Legal Standard

Federal Rule of Evidence 201, made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 9017, provides in relevant part, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A court may also take judicial notice of its own documents or documents filed before other courts. *See Kranich v. Girardi*, 720 F. App'x 870, 871 (9th Cir. 2018) (taking judicial notice of documents filed before another court); *Reyn's Pasta*

*Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (same); *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998) (same). When a court takes judicial notice of another court's records, "it may do so not for the truth of the facts recited therein, but for the existence of the [record], which is not subject to reasonable dispute over its authenticity." *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001). The decision to take judicial notice is reviewed for an abuse of discretion. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018), *cert. denied sub nom. Hagan v. Khoja*, 139 S. Ct. 2615 (2019). Even if a court errs in taking judicial notice of certain facts, such error can be harmless and provide no grounds to reject or modify a bankruptcy court's proposed findings of fact and conclusions of law. *See In re Manesh,* 774 F. App'x 413, 414 (9th Cir. 2019) (noting that Fed. R. Bankr. P. 9005 incorporates Fed. R. Civ. P. 61's harmless error rule into bankruptcy proceedings); *In re Schumacher*, 617 F. App'x 773, 774 (9th Cir. 2015) (same).

### 2.    Matters Related to Saipan Air

Defendants argue that the Bankruptcy Court improperly took judicial notice of facts related to Saipan Air, primarily taking issue with the notice of a declaration from Saipan Air representative Adam Ferguson attached to a proof of claim filed by Saipan Air in the Swift administrative bankruptcy case docket (the "Ferguson Declaration"). (*See* Doc. 1 at 77–79). Defendants assert that the Bankruptcy Court taking judicial notice of the Saipan Air facts was improper for five reasons: (1) there was no need for the Bankruptcy Court to take judicial notice of additional Saipan Air facts, (2) no party asked the Bankruptcy Court to take judicial notice of these facts, (3) the allegations in the Ferguson Declaration are disputed and Defendants had no opportunity to contest them, (4) Adam Ferguson did not appear at trial for cross-examination, so his testimony via declaration is in violation of the Local Rules for the United States Bankruptcy Court for the District of Arizona and against due process, and (5) the Ferguson Declaration is hearsay.

Regarding Defendants' first two points, the "need" for a court to take judicial notice is not a standard by which the propriety of taking judicial notice is judged, nor does any

similar standard exist in Federal Rule of Evidence 201 or Federal Rule of Bankruptcy Procedure 9017. Additionally, a court "may take judicial notice on its own," and "may take judicial notice at any stage of the proceeding." Fed. R. Evid. 201(c)(1), (d). Therefore, a party does not have to ask a court to take judicial notice of certain facts for a court to do so.

Regarding Defendants' final three points, each of these points seems to take issue with the truth of the information within the Ferguson Declaration. The Bankruptcy Court, however, when referring to the Ferguson Declaration, noted that the "[Bankruptcy] Court makes no finding as to the veracity of any of the allegations set forth in this declaration." (Doc. 19-2 at 112 n.219). Thus, the truth of the information within the Ferguson Declaration is not relevant to the Bankruptcy Court's ultimate findings and conclusions, as the Bankruptcy Court did not rely on the truth of the information when making its proposed findings of fact and conclusions of law. The Bankruptcy Court merely took notice of the existence of the Ferguson Declaration, rather than the truth of the facts therein.

To be sure, the Bankruptcy Court discussed the information within the Ferguson Declaration when it stated, "the [Bankruptcy] Court does wonder why Burdette would be involved in New Swift post-Transaction," as such a claim is contained within the Ferguson Declaration. This statement, however, is far from a finding of fact as to the veracity of the information within the Ferguson Declaration.

Even if the Ferguson Declaration was the subject of improper judicial notice, any error was harmless as the information within it does not bear on the proposed findings of fact or conclusions of law of the Bankruptcy Court, and there is ample evidence in the record to support the findings and conclusions in the Report and Recommendation. *See In re Manesh,* 774 F. App'x at 414; *In re Schumacher*, 617 F. App'x at 774. Thus, the Bankruptcy Court did not improperly take judicial notice of facts related to Saipan Air, and even if it did, such improper notice was harmless.

### 3.    "Common Practice" in Transactions

Defendants argue that the Bankruptcy Court improperly took judicial notice of facts

related to common practice in business transactions like the Transaction, primarily taking issue with the notice of an article by J.B. Heaton (the "Heaton Article"). (*See* Doc. 1 at 79–82). Defendants argue that the Bankruptcy Court citing the Heaton Article at notes 409 and 633 inserted "a new (and undisclosed) 'expert' witness after the close of evidence." (*Id.* at 81). The Bankruptcy Court, however, did not go so far.

When referencing the Heaton Article, note 409 states, in relevant part, that "[t]he [Bankruptcy] Court is not finding that a solvency opinion should have been obtained by Defendants in advance of the closing of the Transaction. However, the [Bankruptcy] Court does note that neither the Defendants nor the Buyers required a pre-Transaction solvency opinion concerning Swift." (Doc. 19-2 at 150 n.409). The Bankruptcy Court did not use the Heaton Article to make an adverse factual finding regarding Defendants' actions, but simply noted that solvency opinions are not uncommon for certain transactions. The same note cites the American Institute of Certified Public Accountants (AICPA) *Standards Regarding Valuation*—which Defendants requested the Bankruptcy Court take judicial notice of—to similarly support the point that business valuations, which include solvency opinions, are not uncommon in certain transactions, like acquisitions. (Doc. 19-2 at 150 n.409). Thus, the Bankruptcy Court did not improperly use the Heaton Article to make any findings at note 409. Even if the Heaton Article was improperly cited, any error was harmless as the AICPA *Standards Regarding Valuation* provide similar information.

When citing the Heaton Article, note 633 states, in relevant part, that "[t]he [Bankruptcy] Court does not find the Defendants' failure to obtain a solvency opinion as dispositive as to the question of solvency, but mentions the common practice of obtaining such opinions to further highlight another failure of Defendants to protect the interest of Swift in the lead up to the Transaction." (*Id.* at 224 n.633). Again, the Bankruptcy Court clearly did not use the Heaton Article to make an adverse factual finding, but simply to note the common practice of obtaining a solvency opinion in certain transactions. Thus, the Bankruptcy Court did not improperly use the Heaton Article to make any findings at note 633. Even if the Heaton Article was improperly cited, any error was harmless as

similar information is contained in the AICPA *Standards Regarding Valuation*.

Defendants further argue that the Heaton Article is not applicable to the instant case and that it does not support the proposition that obtaining solvency reports is common practice in acquisitions. (*See* Doc. 1 at 80). Yet, as discussed above, the Bankruptcy Court did not use the Heaton Article to arrive at any factual findings, and the points made by the Bankruptcy Court are supported by the record. Thus, Defendants' arguments here do not show an abuse of discretion by the Bankruptcy Court.

Defendants' also had an opportunity to be heard by the Bankruptcy court regarding the above acts of judicial notice. Defendants submitted their concerns regarding judicial notice to the Bankruptcy Court, (*see* Doc. 19-7 at 475–81), and had an opportunity to be heard by the Bankruptcy Court on these objections, *see* Transcript of Hearing or Trial on 12/3/2019, *In re Swift Air, L.L.C.*, No. 14-AP-00534 (Bankr. D. Ariz. Dec. 12, 2019), ECF No. 549. It is clear from the transcript of the hearing before the Bankruptcy Court and from the Report and Recommendation that the Bankruptcy Court considered and rejected Defendants' objections.

Because the Bankruptcy Court did not take improper judicial notice of certain facts, and even if it did, any error from such improper notice was harmless, the Bankruptcy Court did not abuse its discretion and the Court overrules this objection.

## IV.    CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that Defendants' objection to the Bankruptcy Court's proposed finding of fact that Moyes and Burdette were not "Officers" of Swift for purposes of the Operating Agreement, *see supra* Section III.A.18, is **SUSTAINED**.

**IT IS FURTHER ORDERED** that all of Defendants' other objections to the Bankruptcy Court's proposed findings of fact and conclusions of law are **OVERRULED**.

**IT IS FURTHER ORDERED ADOPTING** the Bankruptcy Court's proposed findings of fact and conclusions of law in their entirety, save the proposed finding of fact that Moyes and Burdette were not "Officers" of Swift for purposes of the Operating

1    Agreement.

2    **IT IS FURTHER ORDERED:**

3    Granting judgment in favor of Plaintiff jointly and severally against Jerry Moyes

4    and Kevin Burdette in the amount of $12,136,669.00 plus interest at the rate of 0.17% per

5    annuum from the date of this order. These damages are awarded on an "alternative" basis

6    meaning that any payment towards the preference damages associated with the Related

7    Appeals would result in a corresponding decrease in damages awarded on account of

8    Moyes's and Burdette's breaches of fiduciary duties.

9    Granting judgment in favor of Defendants, except Transjet, Inc. and Swift Aircraft

10   Management, LLC on Counts One and Count Two of the Complaint.

11   Pursuant to Federal Rule of Bankruptcy Procedure 8024(a), the Clerk of the Court

12   shall enter judgment accordingly.

13

14   Dated this 1st day of December, 2020.

15

16

17                                        James A. Teilborg
                                          Senior United States District Judge
18

19

20

21

22

23

24

25

26

27

28